# LIBERTARIAN ASSOCIATION OF MASSACHUSETTS & another[1] *vs.* SECRETARY OF THE COMMONWEALTH.

Suffolk. February 9, 2012. - June 18, 2012.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Elections,* Ballot, Validity of nomination papers. *Constitutional Law,* Elections, Equal protection of laws, Vagueness of statute. *Supreme Judicial Court,* Justiciable question. *Jurisdiction,* Justiciable question. *Practice, Civil,* Election case, Moot case. *Moot Question. Secretary of the Commonwealth.*

This court concluded that a civil action involving the proper interpretation of a Massachusetts election law governing the filling of a vacancy and its application to the presidential and vice-presidential candidates of a minor political party posed an actual controversy, such that declaratory relief pursuant to G. L. c. 231A, § 1, was available, where, although the dispute technically was moot, both parties to the action had a definite interest in the subject matter of the election law; where the issue was one of public importance, had been fully argued on both sides, and was certain (or at least very likely) to arise again in similar factual circumstances and appellate review could not be obtained before the recurring question would again be moot; and where the broad, remedial purposes of the declaratory judgment act and the unprecedented procedural posture of the case informed this court of the utility of exercising its jurisdiction. [546-549]

This court concluded that G. L. c. 53, § 14, which governs the filling of a vacancy when a candidate nominated for "state, city or town office" withdraws, dies, or otherwise becomes ineligible prior to an election, encompasses candidates for presidential elector, but this court did not reach the question whether presidential and vice-presidential candidates came within the class of candidates governed by the statute [549-554]; further, this court concluded that, regardless of the identity of the "persons" making a substitution where a candidate withdraws his nomination, the language of the statute obligates those persons to fill the vacancy in the same manner as the original nomination, which, in the case of a candidate nominated by nomination papers, means the substituted candidate must gather the requisite number of signatures from registered voters, submit those signatures for certification to local election officials, and subsequently file them with the Secretary of the Commonwealth [554-557].

In the context of a civil action involving the proper interpretation of G. L. c. 53, § 14, which governs the filling of a vacancy when a candidate nominated for "state, city or town office" withdraws, dies, or otherwise

[1]Libertarian National Committee, Inc.

becomes ineligible prior to an election, and its application to the presidential and vice-presidential candidates of a minor political party, this court declined to interpret art. 9 of the Massachusetts Declaration of Rights as extending protections beyond Federal constitutional requirements [557-559]; further, this court concluded that G. L. c. 53, § 14, does not violate art. 9, where there was no merit to the overarching assertion by a minor political party of a constitutional "right of substitution" of such candidates, and where the ballot access regime did not unduly burden the recognized rights of minor political parties [559-568].

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on August 12, 2011.

The case was reported by *Cordy*, J.

*Andrew Palid* (*Matthew C. Baltay* with him) for the plaintiffs.

*Amy Spector*, Assistant Attorney General, for the defendant.

CORDY, J. This case involves the proper interpretation of a Massachusetts election law that governs the filling of a vacancy where a candidate nominated for "state, city or town office" withdraws, dies, or otherwise becomes ineligible prior to an election, G. L. c. 53, § 14 (§ 14), and its application to the presidential and vice-presidential candidates of a minor political party.

*Background and procedural history.* In early 2008, a pair of candidates for the presidency and vice-presidency of the United States of America began collecting the signatures of registered voters on nomination papers circulating throughout the Commonwealth.[2] The nomination papers bore the political designation "Libertarian." These candidates, however, failed to secure the indorsement of the national Libertarian party at its convention in May, 2008. The Libertarian Association of Massachusetts (LAM) then contacted the Secretary of the Commonwealth (Secretary) and requested that the names of the persons who won the national party indorsement be substituted for the names of the candidates listed on the nomination papers being circulated in the Commonwealth. The Secretary refused.

---

[2]As described *infra*, the Libertarian Association of Massachusetts (LAM) was not considered a "political party" under Massachusetts law for the purposes of the 2008 general election. See G. L. c. 50, § 1. Therefore, it — and any candidate wishing to use it as a "political designation" — was required to submit nomination papers bearing the signatures of 10,000 registered voters to gain access to the ballot in the general election. See G. L. c. 53, § 6.

Thereafter, the plaintiffs brought suit in the United States District Court for the District of Massachusetts, where a preliminary injunction was issued requiring the Secretary to include the names of the nationally indorsed candidates on the ballot. *Barr* v. *Galvin*, 584 F. Supp. 2d 316 (D. Mass. 2008) (*Barr I*). The Federal judge who issued the injunction subsequently granted summary judgment for the plaintiffs, ruling that § 14 was unconstitutionally vague and its application to the plaintiffs violative of the equal protection clause to the Fourteenth Amendment to the United States Constitution. *Barr* v. *Galvin*, 659 F. Supp. 2d 225 (D. Mass. 2009) (*Barr II*). The United States Court of Appeals for the First Circuit (First Circuit) reversed the judge's ruling with regard to the equal protection clause. *Barr* v. *Galvin*, 626 F.3d 99, 108-111 (1st Cir. 2010) (*Barr III*). It also abstained from interpreting § 14 or deciding the plaintiffs' "void for vagueness" claim, positing that any "clarification by judicial interpretation" was best left to "Massachusetts courts . . . in the first instance." *Id.* at 107-108, citing *Railroad Comm'n of Tex.* v. *Pullman Co.*, 312 U.S. 496, 499-502 (1941) (*Pullman* abstention). On remand, the District Court judge stayed the "void for vagueness" claim "pending a state court interpretive clarification of the state statute," and dismissed all other claims without prejudice. *Barr* v. *Galvin*, 755 F. Supp. 2d 293, 295 (D. Mass. 2010) (*Barr IV*). He also rejected the plaintiffs' subsequent request to certify a question to this court regarding the interpretation of § 14. *Barr* v. *Galvin*, 793 F. Supp. 2d 463, 465 (D. Mass. 2011) (*Barr V*).

Consequently, the plaintiffs filed a complaint against the Secretary in the county court, seeking a declaration under G. L. c. 231A, § 1, that § 14 provides a minor party, which does not qualify as a "political party" under Massachusetts law, a means to "substitute" the names of presidential and vice-presidential candidates chosen at the minor party's national convention for those listed on nomination papers being circulated and signed by registered voters throughout Massachusetts. In the alternative, they sought a declaration that § 14 does not afford minor parties a substitution mechanism and that this failure violates art. 9 of the Massachusetts Declaration of Rights. Finally, the plaintiffs argued that, were the single justice unable to explicate

the meaning of § 14, he must deem that provision unconstitutionally vague. The Secretary moved to dismiss this action on jurisdictional grounds, arguing that the plaintiffs lacked standing and that they failed to establish an "actual controversy" for the purposes of G. L. c. 231A, § 1. The single justice reserved and reported the matter without decision to the full court.

Before us, the Secretary reiterates his threshold argument concerning G. L. c. 231A, § 1, and challenges the merits of the plaintiffs' claims. He contends that § 14 is limited in scope and, assuming arguendo it applies to presidential electors, requires only that vacancies be filled "in the same manner" as the "original nomination," thereby obligating the plaintiffs and any candidates chosen at their national convention to fulfil the same requirements as the original candidates listed on the nomination papers — that is, by submitting nomination papers bearing the signatures of 10,000 registered voters. See note 2, *supra.* If the time between the national convention and the signature filing deadline is insufficient to complete this task, the Secretary contends, § 14 does not provide any additional recourse to minor parties or the candidates their members indorsed at a national convention. According to the Secretary, the lack of recourse in these circumstances is not unconstitutional because the protections of art. 9 are coextensive with those of the Federal equal protection clause, with which the Massachusetts ballot access provisions have been found to comport. See *Barr III, supra* at 108-111.

We conclude that this matter is properly before us. The plaintiffs have established an "actual controversy" because the initial dispute between the parties, while moot, is "capable of repetition, yet evading review," *id.* at 105, quoting *Southern Pac. Terminal Co.* v. *ICC,* 219 U.S. 498, 515 (1911), and because our decision today will have an immediate impact in the ongoing Federal proceedings between the parties. On the merits, we conclude that § 14 applies to presidential electors and assume (but need not decide) by extension to the presidential and vice-presidential candidates the electors have pledged to support. Although § 14, as written, is not a model of clarity and its meaning not without uncertainty, we interpret it in a manner largely consistent with the interpretation proffered by the Secretary.

Finally, aligning our analysis under art. 9 with that of the equal protection clause, we perceive no constitutional deficiency in the election law scheme.

*Statutory framework.* Within the Commonwealth, only a certain subclass of active political organizations receives the formal label "[p]olitical party" and the corresponding benefits and privileges afforded that status. To attain that label, a political organization must either (1) have had a candidate for State-wide office garner at least three per cent of the votes cast in the most recent biennial election; or (2) enroll a number of voters "equal to or greater than one percent of the entire number of voters registered in the commonwealth." G. L. c. 50, § 1. Once a political organization satisfies either requirement, it is eligible to conduct "primaries and caucuses for the nomination of city and town officers," *id.*, among other things. If a political organization does not satisfy either requirement, it receives no formal recognition under Massachusetts law but may serve nonetheless as a "[p]olitical designation."[3]

One of the privileges of attaining party status is the ease with which a recognized political party may place its candidates on the ballot for the general election. With regard to presidential and vice-presidential candidates, the party's State committee need only submit a certificate of nomination to the Secretary bearing the surnames of the party's chosen candidates by the second Tuesday of the September preceding the election.[4] G. L. c. 53, § 8, first par. This certificate must include the names and residences of the selected presidential electors, along with a written acceptance and pledge by each to vote for the candidates for the presidency and vice-presidency named in the filing.[5] *Id.*

Other candidates for the presidency and vice-presidency,

---

[3]By statute, a "[p]olitical designation" is a label of three words or less that a candidate unaffiliated with a recognized political party may represent. G. L. c. 50, § 1. In practice, it may allude to a minor party with which the candidate is affiliated or to a general platform the candidate supports. See Secretary of the Commonwealth Elections Division, Massachusetts Directory of Political Parties and Designations (2012).

[4]Despite its outward appearance, this process does not occur without some oversight from the Commonwealth. For example, G. L. c. 52, § 1, imposes various requirements on the manner in which a political party elects its State committee members.

[5]As prescribed by art. II, § 1, of the United States Constitution, the President

whether affiliated with a political organization or not, must follow a different path to the ballot. See G. L. c. 53, §§ 6-10. This class of candidates must file nomination papers for their chosen presidential electors, signed by at least 10,000 registered voters. G. L. c. 53, § 6. These nomination papers must include the names of the presidential and vice-presidential candidates, as well as the names and residences of the candidates for presidential electors who have pledged to vote for them. G. L. c. 53, § 8, first par. The papers also may include "the political designation, if any, which [the candidate] represents."[6] *Id.*

The nomination papers must be submitted to election officials through a two-step process. First, they must be provided to the registrars of the cities or towns in which the signatories reside, so that the registrars can certify whether the signatures belong to registered voters. G. L. c. 53, § 7, second par. Next, the nomination papers — once certified — must be filed with the Secretary. G. L. c. 53, § 10, first par. The deadlines for these submissions are precise, and intertwined: nomination papers must be filed with the Secretary by the last Tuesday in the August preceding the election, *id.*; they must be submitted to the local registrars for certification at least twenty-eight days before the deadline for filing with the Secretary, G. L. c. 53, § 7; and certification must be complete no later than the seventh day before the deadline for filing with the Secretary. *Id.* "In 2008, the deadline for submitting such nomination papers to local [registrars] was July 29. . . . In turn, the deadline for transmitting them to the Secretary was August 26." (Citations omitted.) *Barr III, supra* at 102.

and Vice-President are "not elected by the people but rather by electors appointed by the states — the so-called Electoral College." Williams, Reforming the Electoral College: Federalism, Majoritarianism, and the Perils of Subconstitutional Change, 100 Geo. L.J. 173, 180 (2011), discussing *Bush* v. *Gore*, 531 U.S. 98, 104 (2000). "The Constitution leaves it to each state to determine how its electors are selected," *id.*, citing art. II, § 1, cl. 2. Massachusetts has adhered to a direct vote system since 1820. Ordeshook, Constitutions, Elections and Election Law, 87 Tex. L. Rev. 1595, 1621 (2009), citing *McPherson* v. *Blacker*, 146 U.S. 1, 32 (1892).

[6]In selecting his or her "political designation," a candidate cannot employ the name of a recognized political party or "the name of any organization which has been adjudicated subversive under [G. L. c. 264, § 18]." G. L. c. 53, § 8, second par.

The aforementioned provisions express the two routes by which the names of presidential and vice-presidential candidates may appear on the ballot for the general election.[7] The parties, however, contest whether the election laws, in particular § 14, provide a mechanism for *replacing*, in appropriate circumstances, the names of candidates who have qualified for ballot access.

While we reserve our discussion of this statutory provision for later in the opinion, we recite here the pertinent part of § 14:

> "If a candidate nominated for a state, city or town office dies before the day of election, or withdraws his name from nomination, or is found ineligible, the vacancy . . . may be filled by the same political party or persons who made the original nomination, and in the same manner; or, if the time is insufficient therefor, the vacancy may be filled, if the nomination was made by a convention or caucus, in such manner as the convention or caucus may have prescribed, or, if no such provision has been made, by a regularly elected general or executive committee representing the political party or persons who held such convention or caucus."

*Facts.* We turn now to the facts, which have been well-documented in the various Federal court opinions concerning this dispute. See *Barr III, supra* at 102-104; *Barr II, supra* at 226-227; *Barr I, supra* at 318-319.

In 2007, the LAM,[8] which was not then a recognized "political party" under Massachusetts election laws, began preparing for

---

[7] In keeping with the requirements of the Electoral College, although the names of the presidential and vice-presidential candidates appear on the ballot, they do so only as placeholders for the slate of presidential electors obligated to vote for them. G. L. c. 54, § 78 ("In order to vote for presidential electors, the voter shall make a cross [X] in the square at the right of the party or political designation appearing on the ballot at the right of the surnames of the candidates for president and vice president, to vote for whom such candidates for electors are nominated; and the making of a cross as aforesaid shall be deemed and taken as a vote for such candidates for presidential electors . . .").

[8] In 2008, the LAM was called the Libertarian Party of Massachusetts. The group changed its name in 2010, yet the organization remained the same. For the sake of simplicity, we refer to it throughout as "the LAM" or "the association."

the 2008 general election. In July and September, George Phillies, then-chair of the LAM, sent an electronic mail message (e-mail) to the Secretary inquiring whether, if the presidential and vice-presidential candidates for whom the association collected signatures in Massachusetts did not receive the Libertarian party's indorsement at its national nominating convention, scheduled for May, 2008, the LAM could substitute on the ballot their names for the actual candidates selected. "In October of 2007, an aide to the Secretary responded that the Secretary's office could 'prepare a form that allows members of the party to request the substitution of the candidate.' " *Barr III, supra* at 103. Once nomination papers became available in February, 2008, Phillies began circulating papers listing himself as a presidential candidate and Chris Bennett as a vice-presidential candidate. The papers also named the requisite number of presidential electors and identified the slate's "political designation" as "Libertarian."

In May, three months into this campaign, the Libertarian National Committee hosted its convention in Denver, Colorado. There, Phillies and Bennett competed for the national organization's indorsement. They ultimately lost to Bob Barr and Wayne A. Root, who became the organization's presidential and vice-presidential nominees, respectively.

After the convention, Phillies returned to Massachusetts (where he had collected approximately 7,000 signatures on his and Bennett's nomination papers) and, on May 29, 2008, again corresponded with the Secretary's office, asking for the form mentioned in the previous exchange. In this e-mail, however, Phillies explicitly referred to the presidential and vice-presidential candidates listed on the nomination papers as "stand-ins," and informed the Secretary that the "actual candidates, who were not the same as the stand-ins, were chosen at the Libertarian Party national convention [in May]." In response, an attorney in the elections division of the Secretary's office conceded that, "in certain rare circumstances, [the office had authorized] ballot substitution,"[9] but, she emphasized, the Secretary had "not applied a process which would obviate the statutory mechanism

[9]The Secretary of the Commonwealth (Secretary) had allowed the U.S. Taxpayers Party in 1996 and the Reform Party in 2000 to substitute candidates selected at their national nominating conventions for those listed on their

for a Presidential candidate of a political designation to seek ballot access when this mechanism remains available," nor had the Secretary "interpreted the election laws to authorize the use of placeholder names or stand-in candidates." Moreover, she noted, the deadline to submit nomination papers to the local registrars (July 29, 2008) was two months away; thus, unlike in previous circumstances where the Secretary had allowed candidate substitution, see note 9, *supra*, there was ample time to obtain the requisite number of signatures for the nominees selected at the national convention. Therefore, the aide recommended that the LAM stop collecting signatures for Phillies and Bennett and begin gathering signatures in support of Barr and Root.[10] Despite this recommendation, Phillies continued circulating the nomination papers for his and Bennett's candidacies, ultimately gathering well over the 10,000 signatures required by statute. He submitted these papers in a timely manner, and they subsequently were certified and filed with the Secretary, thereby qualifying Phillies and Bennett for ballot access. "In contrast, Barr and Root did not submit any nomination papers, did not provide any evidence that they had secured the necessary signatures, and did not identify any presidential electors."[11] *Barr III, supra* at 103.

*Discussion.* 1. *Justiciability.* Before reaching the merits of the plaintiffs' claims, we consider whether the instant action poses an "actual controversy," such that declaratory relief under G. L. c. 231A, § 1,[12] would be available.

An actual controversy arises under our law where there is "a

Massachusetts nomination papers. In both cases, the minor party's convention occurred after or close to the filing deadline. In 2004, the Secretary also publicly intimated that he would allow "substitution" of an independent presidential candidate's running mate whom the presidential candidate had not selected until mid-June. The Secretary, however, ultimately declined to grant the "substitution."

[10] "The Secretary likewise notified the Libertarian National Committee that the requested substitution was not authorized, but that the usual statutory process of circulating and filing nomination papers was available as a means of getting [the nationally indorsed nominees'] names on the statewide ballot." *Barr v. Galvin*, 626 F.3d 99, 103 (1st Cir. 2010) (*Barr III*).

[11] There is no evidence in the record that George Phillies and Chris Bennett formally withdrew their nomination papers.

[12] General Laws c. 231A, § 1, states in pertinent part that the "supreme judicial court . . . may on appropriate proceedings make binding declarations

real dispute caused by the assertion by one party of a legal relation, status or right in which he has a definite interest, and the denial of such assertion by another party also having a definite interest in the subject matter, where the circumstances attending the dispute plainly indicate that unless the matter is adjusted such antagonistic claims will almost immediately and inevitably lead to litigation." *School Comm. of Cambridge* v. *Superintendent of Sch. of Cambridge*, 320 Mass. 516, 518 (1946). See, e.g., *Department of Community Affairs* v. *Massachusetts State College Bldg. Auth.*, 378 Mass. 418, 423 (1979) (*Department of Community Affairs*). Accordingly, declaratory relief is reserved for real controversies and is not a vehicle for resolving abstract, hypothetical, or otherwise moot questions. *Massachusetts Ass'n of Indep. Ins. Agents & Brokers* v. *Commissioner of Ins.*, 373 Mass. 290, 292-293 (1977). Within these constraints, however, the declaratory judgment act must be "liberally construed," so as to effectuate its remedial goals of "remov[ing], and . . . afford[ing] relief from, uncertainty and insecurity with regard to rights [and] duties." G. L. c. 231A, § 9. See *Entergy Nuclear Generation Co.* v. *Department of Envt'l Protection*, 459 Mass. 319, 327-328 (2011).

Here, both the plaintiffs and the Secretary "unquestionably [have] a 'definite interest in the subject matter' " of § 14, see *Department of Community Affairs, supra*, a provision that, as both the United States District Court and the United States Court of Appeals for the First Circuit have posited, is riddled with uncertainties in this context. See *Barr III, supra* at 106-107; *Barr II, supra* at 228-230; *Barr I, supra* at 320. The plaintiffs also have exposed these interests and uncertainties in litigation stemming from an identifiable dispute borne of the 2008 presidential election; they do not come to us with an abstract puzzle of statutory interpretation. See *Woods Hole, Martha's Vineyard & Nantucket S.S. Auth.* v. *Martha's Vineyard Comm'n*, 380 Mass. 785, 792 (1980), citing *Department of Community Affairs, supra* at 422-423 ("Questions of statutory interpretation, by themselves, do not rise to the level of actual controversy").

of right, duty, status and other legal relations sought thereby, either before or after a breach or violation thereof has occurred in any case in which an actual controversy has arisen."

Although this underlying dispute is technically moot (the 2008 election having arisen and concluded in the past), we previously have entertained petitions for declaratory relief "where the issue was one of public importance, where it was fully argued on both sides, where the question was certain, or at least very likely to arise again in similar factual circumstances, and especially where appellate review could not be obtained before the recurring question would again be moot." *Commissioner of Correction* v. *McCabe*, 410 Mass. 847, 851 (1991), quoting *Norwood Hosp.* v *Munoz*, 409 Mass. 116, 121 (1991). See, e.g., *Metros* v. *Secretary of the Commonwealth*, 396 Mass. 156, 159-160 (1985) (challenge to Massachusetts disaffiliation provision falls within exception to mootness bar for purposes of declaratory relief). The present case satisfies this standard. See *Barr III*, *supra*, citing *Illinois State Bd. of Elections* v. *Socialist Workers Party*, 440 U.S. 173, 187 (1979) (LAM's claims capable of repetition yet evading review because of "temporal parameters" of ballot access procedures and association's inability to secure — or maintain — party status).[13] Compare *Metros* v. *Secretary of the Commonwealth*, *supra*, with *Lockhart* v. *Attorney Gen.*, 390 Mass. 780, 785 (1984) (no actual controversy where alleged violation of plaintiffs' right to gather signatures for initiative petition unlikely to recur in substantially same form).

Finally, given the broad, remedial purposes of the declaratory judgment act, even were we to recognize the flaws the Secretary has identified in the plaintiffs' complaint, "we [likely] would still exercise our discretion to consider the substantive issues raised therein." *Entergy Nuclear Generation Co.* v. *Department of Envt'l Protection*, *supra* at 328, citing *Southbridge* v. *Southbridge Water Supply Co.*, 371 Mass. 209, 214-215 (1976). The

---

[13]We note here that, although Barr and Root did not receive the requisite percentage of votes to qualify the LAM as a political party, a candidate for the United States Senate in 2008 who identified himself as "Libertarian" did. *Barr III*, *supra* at 104. Thus, the LAM became a recognized political party in Massachusetts following the 2008 Statewide election. *Id.* The association, however, did not maintain that status, and consequently, the term "Libertarian" has reverted to a "political designation" for the purposes of the 2012 general election. See Secretary of the Commonwealth, Elections Division, Massachusetts Directory of Political Parties and Designations (2012).

posture of this case, which comes to us on the heels of a First Circuit opinion invoking the doctrine of the *Pullman* abstention, is unprecedented within the Massachusetts court system. See *Barr III, supra* at 107-108. While this fact alone could not compel us to exercise our jurisdiction under G. L. c. 231A, § 1, cf. *Payton* v. *Abbott Labs*, 386 Mass. 540, 575 (1982) (declining to answer definitively one of four certified questions from Federal District Court), it nonetheless informs the utility of our decision to do so. Despite the Secretary's arguments to the contrary, the Federal proceedings remain unresolved in light of the abstention order; pursuant to the First Circuit's directive, the Federal District Court explicitly stayed further consideration of the "void for vagueness" claim in anticipation of State court clarification of the challenged provision, § 14. *Barr IV, supra* at 295. See 17A Moore's Federal Practice § 122.07 (3d ed. 2012) (describing procedural option of abstention). Thus, our decision today will "serve[] the useful purpose and give[] the practical effect of terminating the uncertainty or controversy" still present in those proceedings. *Perschall* v. *State*, 697 So. 2d 240, 253 (La. 1997). We see no reason to delay a decision on the merits.[14]

2. *General Laws c. 53, § 14.* Turning to the merits of the plaintiffs' claims, we first address the "two types of impreci-sion" the First Circuit identified in § 14:

> "First, [the statute] refers to candidates seeking 'state, city or town office,' but provides no further elaboration as to the specific offices that are encompassed within that rubric. This, in turn, leaves open to question whether candidates for presidential electors . . . and, by reference, presidential and vice-presidential candidates, come within its sweep. Second, [§] 14 explains that vacancies 'may be filled by the same political party or persons who made the original nomination.' . . . [T]he reference to 'persons who made the original nomination' arguably could apply to the [LAM] or, alternatively, to the individuals who signed the nomination papers qualifying Phillies and Bennett for inclu-sion on the ballot."

---

[14]We also find no cause to second guess the First Circuit's decision to abstain from deciding the issues surrounding § 14, rather than certifying to this court a question regarding its proper interpretation.

*Barr III, supra* at 107.

We resolve these imprecisions by reference to familiar canons of statutory interpretation, "[o]ur primary duty in interpreting a statute [being] 'to effectuate the intent of the Legislature in enacting it.' " *Wheatley* v. *Massachusetts Insurers Insolvency Fund*, 456 Mass. 594, 601 (2010), quoting *International Org. of Masters* v. *Woods Hole, Martha's Vineyard & Nantucket S.S. Auth.*, 392 Mass. 811, 813 (1984). Where the words of a statute are unambiguous, we ordinarily view them as "conclusive as to legislative intent," *Sterilite Corp.* v. *Continental Cas. Co.*, 397 Mass. 837, 839 (1986), and adhere to their plain meaning. *Telesetsky* v. *Wight*, 395 Mass. 868, 872 (1985). Conversely, where the words of a statute are ambiguous, or seemingly in conflict with one another, we interpret the statute, " 'if possible, so "as to make it an effectual piece of legislation in harmony with common sense and sound reason" ' . . . and 'tak[ing] care to . . . carry out the legislative intent.' " *Wolfe* v. *Gormally*, 440 Mass. 699, 704 (2004), quoting *Massachusetts Comm'n Against Discrimination* v. *Liberty Mut. Ins. Co.*, 371 Mass. 186, 190 (1976).

a. *Scope of "state office"*. As the Federal courts observed, the words "state . . . office" in § 14 are ambiguous with regard to their application to the position of "presidential elector." Neither term is included in the definitional section of the election laws, G. L. c. 50, § 1, and those definitions that appear relevant — "State election" and "State officer" — suffer from some internal tension, which render them inconclusive on the subject.[15] Further, in practice, the post of presidential elector is markedly different from that of traditional "state . . . office," such as the governorship. While the individuals who fill those offices are elected by and serve the people of Massachusetts

---

[15]The statute defines "State election" as "any election at which a national, state, or county officer . . . is to be chosen by the voters," and "State officer" as "*any* person to be nominated at a state primary or chosen at a state election and shall include United States senator and representative in Congress" (emphasis added). G. L. c. 50, § 1.

Read together, these provisions yield a slightly troublesome result: by incorporating the term "State election," the term "State officer" includes "national, state, or county officer" and, thus, is "defined to be broader than itself." *Barr* v. *Galvin*, 659 F. Supp. 2d 225, 228-299 (D. Mass. 2009) (*Barr II*).

exclusively, the men and women acting as presidential electors are selected by the people of Massachusetts to cast their votes, together with electors from the other States in the Union, for the highest elected Federal office, the presidency. Thus, presidential electors arguably serve both a State and a national purpose, and do not fit neatly within the construct of a "state . . . office."

These initial hurdles do not mean, however, that the Legislature necessarily intended to exclude presidential electors from the procedural dictates of § 14. They simply goad us to undertake a holistic evaluation of the election law regime, and to ascertain as we must "the intent of the statute from all its parts and from the subject matter to which it relates." *DiGiacomo* v. *Metropolitan Prop. & Cas. Ins. Co.*, 66 Mass. App. Ct. 343, 346 (2006). See *Sterilite Corp.* v. *Continental Cas. Co.*, *supra* at 839 (courts "should not accept the literal meaning of the words of a statute without regard for that statute's purpose and history"). Thus, we turn to the statutory scheme "as a whole," *Wolfe* v. *Gormally*, *supra*, mindful that "[t]he general purpose of the Legislature in enacting the statutes regulating . . . elections was to make a reasonably consistent and harmonious body of law . . . which should have the final result of filling the offices required by law."[16] *Thacher* v. *Secretary of the Commonwealth*, 250 Mass. 188, 190 (1924).

First, with regard to the hybrid function of the presidential electors, we find instructive (in this limited fashion) the statutory definition of "State officer." Under G. L. c. 50, § 1, that term explicitly includes United States Senators and Representatives from Massachusetts, who, like presidential electors, are elected by Massachusetts voters, yet serve a Federal function. Thus, to some extent, the Legislature anticipated the scope of the term "State officer" — a term analogous to "state . . . office" — to extend beyond its literal meaning. Cf. *In re Green*, 134 U.S. 377, 379 (1890) ("Although [presidential] electors are appointed and act under and pursuant to the Constitution of the United States, they are no more officers or

---

[16]Under art. II, § 1, and G. L. c. 54, § 151, the position of presidential elector is an "office[] required by law." *Thatcher* v. *Secretary of the Commonwealth*, 250 Mass. 188, 190 (1924).

agents of the United States than are the members of the state legislatures when acting as electors of federal senators, or the people of the States when acting as electors of representatives in Congress"). But see *Williams* v. *Rhodes*, 393 U.S. 23, 38 (1968) (Douglas, J., concurring) ("It is unnecessary in this case to decide whether [presidential] electors are state rather than federal officials . . .").

This suggests to us that the dual nature of presidential electors should not stand as an impediment to their inclusion under § 14, an inference bolstered by the Legislature's treatment of the position elsewhere. Throughout the statutory regime, the Legislature repeatedly includes the position of presidential elector within the class of offices chosen at a "State election," see note 15, *supra*, quoting G. L. c. 50, § 1, and, accordingly, makes various provisions relevant to them. See, e.g., G. L. c. 53, § 6 (signature requirement for nomination papers for "any offices to be filled at a state election," including "presidential electors"); G. L. c. 54, § 43A (order of offices listed on ballots at State election includes "Presidential elector"); G. L. c. 54, § 151. The Legislature also imposes myriad requirements on candidates for "state office" that doubtless apply to candidates for presidential elector. See, e.g., G. L. c. 53, § 7 (imposing on "candidate[s] for . . . state office[s]" contingent deadline for filing nomination papers with city or town registrars); G. L. c. 53, § 17 (obligating Secretary to "provide blank forms for the nomination of candidates for all state offices"). We see no reason to assume that the Legislature would have employed the term "state . . . office" differently in § 14, particularly where it has not enacted another provision relative to the filling of vacancies for presidential elector. Therefore, reading the statute as a whole and in light of its legislative purpose and scope, we conclude that the reference to "candidate[s] for . . . state . . . office" in § 14 is intended to encompass candidates for presidential elector.

From here, we face the more difficult question whether the presidential and vice-presidential candidates themselves come within the class of candidates governed by § 14. The plaintiffs contend that they must, simply by virtue of their association with the presidential electors. The Secretary, however, divorces

the candidates from their electors in this instance and argues that they cannot be considered candidates for "state . . . office" because they seek offices — the presidency and vice-presidency — that are selected at a national convention of the Electoral College, not elected by the voters of Massachusetts alone.

We agree with the premise of the Secretary's argument: the President and Vice-President are elected to lead the United States as a whole and, therefore, occupy quintessentially national offices. Consequently, candidates for those positions should not themselves qualify as "candidates for . . . state . . . office[s]" under § 14. This conclusion, however, only takes us so far and does not fully resolve the problem arising from the inextricable link between the presidential and vice-presidential candidates and their electors. Under G. L. c. 53, § 8, the presidential electors must "pledge" their support to presidential and vice-presidential candidates, who, in turn, must list their slate of presidential electors on any nomination papers circulated throughout the Commonwealth. Thus, the public allegiance of the presidential electors, for whom the people technically cast their vote, see G. L. c. 54, § 78, is a prerequisite to having the names of the presidential and vice-presidential candidates printed on the ballot. See art. II, § 1.

While this constitutionally and statutorily entrenched relationship between presidential electors and the candidates themselves lends credence to the plaintiffs' argument that both should fall under the purview of § 14, it also gives us pause in a manner the parties do not contemplate. If we read § 14 as permitting some body (whether it be a minor party or political organization) to change the names of the presidential and vice-presidential candidates to whom electors are pledged, then what of the statutory duty of electors to vote for the candidates named in the filing? See G. L. c. 53, § 8. Are we to read § 8 as embracing an "amended" filing with the names of the substituted candidates, or to assume the electors' continued allegiance to the original candidates for whom they had pledged (in writing) to vote?[17]

In light of our ultimate interpretation of § 14, we need not

[17]This, in turn, raises the novel question what, if any, control a minor party or political organization may exert on electors nominated through nomination

resolve these issues today. As discussed below, where a "candidate for a state . . . office" nominated through nomination papers withdraws, the party or persons who had supported that nomination must utilize the same nomination procedures (i.e., the signature-gathering requirements of G. L. c. 53, § 6) to gain ballot access for another candidate. Thus, whether they seek to change the names of the electors or the names of the presidential and vice-presidential candidates themselves, such parties or persons must submit a new filing. Under this interpretation, then, our concerns described above fall away.

b. *Scope of "substitution" mechanism.* Moving now to the second disputed portion of § 14, we consider the manner in which that provision allows for the filling of a vacancy where a candidate withdraws his or her nomination. First, we note that § 14 is applicable only when a candidate who has been nominated withdraws, dies, or is otherwise ineligible; thus, the candidate must complete the nomination requirements and formally withdraw before any vacancy is created or may be filled. See G. L. c. 53, § 13. On its face, then, this provision does not apply where a candidate seeks to transfer his or her signatures to another candidate midway through the nomination process.

Once a vacancy is created under § 13, it "may be filled by the same political party or persons who made the original nomination and in the same manner."[18] G. L. c. 53, § 14. In describing the imprecisions contained in this portion of the statute, the First Circuit concentrated on the first clause, asking whom the Legislature had empowered to fill a vacancy. See *Barr III*, *supra* at 107. The parties, however, offer conflicting interpretations of both clauses in this passage, and thus grapple over who the Legislature intended to have the authority to fill a vacancy, as well as the manner in which that authority may be exercised. We consider each question in turn.

With respect to who has the authority to fill a vacancy, the

---

papers bearing the group's "political designation" in a statutory scheme that makes no special concessions for such groups. See *Ray* v. *Blair*, 343 U.S. 214 (1952) (States may allow political parties to require loyalty oaths from electors seeking to run in party's primary).

[18]Because the LAM does not satisfy the statutory definition of "[p]olitical party," which applies in this context, we focus our attention on the word "persons" in § 14.

plaintiffs contend that the statutory language embraces "those persons or entities that requested, circulated, and filed the nomination papers" — in these circumstances, the LAM. The Secretary rejects this construction of the statute, asserting that, although a candidate may identify himself or herself as "Libertarian," the LAM itself does not have a right to dictate which, if any, "Libertarian-affiliated" candidates appear on the Massachusetts ballot because the organization has not achieved party status. Consequently, the Secretary reads the statute as applying to the 10,000 voters who actually signed the nomination papers for the original candidates.

We agree with the Secretary's position that the LAM's status as a political designation has some relevance to this inquiry; the association cannot expect us to disregard its statutory status, or lack thereof, and permit it direct access to the ballot. See G. L. c. 50, § 1; G. L. c. 53, § 8. However, it seems unreasonable to conclude, as the Secretary suggests, that the Legislature intended to restrict the pertinent language of § 14 to the actual signatories of the nomination papers. While it takes 10,000 certified signatures to "make" the nomination, in a sense, it is contrary to reason and experience to assume that so large a group coalesces around a single candidate of their own accord. Rather, the candidates themselves, or the minor party or political organization with which they are affiliated, mobilize volunteers (or contract with a company) to collect the required signatures. See Note, Guarding the Treehouse: Are States "Qualified" to Restrict Ballot Access in Federal Elections?, 80 B.U. L. Rev. 289, 297 (2000). Thus, the better interpretation of the statute comports with this reality and recognizes that some persons or entities must work on the voters themselves, to corral them and to secure their signatures in support of any given candidate.[19]

Despite the Secretary's fears, adopting this interpretation of the statute will not permit candidates unaffiliated with a recognized political party to circumvent the signature-gathering

[19] As the plaintiffs note, the manner in which G. L. c. 50, § 1, operates supports this conclusion. By elevating the "[p]olitical designation" of a candidate who garners more than three per cent of the vote in an election to a "[p]olitical party," *id.*, the Legislature implicitly recognizes the role that minor parties or political organizations may play in a candidacy.

requirements of G. L. c. 53, § 6. This is because, regardless of the identity of the "persons" making the substitution, the plain language of the statute obligates them to fill the vacancy "in the same manner" as the original nomination. G. L. c. 53, § 14. See *Sterilite Corp.* v. *Continental Cas. Co.*, 397 Mass. 837, 839 (1986); *Telesetsky* v. *Wight*, 395 Mass. 868, 872 (1985). In the case of candidates nominated by nomination papers, the "manner" dictated by the Legislature is clear: the candidate must, among other things, gather the signatures of 10,000 voters, submit them for certification to local election officials, and subsequently file them with the Secretary. G. L. c. 53, §§ 6-10. If "time is insufficient" to complete this task, § 14 provides no other means by which a person or party can "replace" a candidate nominated through nomination papers: it plainly confines the limited alternative avenues for filling a vacancy to those candidates nominated by "convention or caucus."

The plaintiffs do not, nor could they, put forth a compelling argument to overcome this unambiguous language. They nonetheless urge us to extrapolate from the latter provision — that contemplating "alternative" mechanisms for filling a vacancy — a legislative intent to defer to the decisions of a minor party where the need to replace a candidate affiliated with it arises and the time to gather the requisite number of signatures is insufficient. This we cannot do. The Legislature has made no provision in the election laws for the internal processes of minor parties or political organizations (as opposed to those of recognized political parties) with regard to the indorsement of presidential candidates.[20] Rather, it has constructed a scheme where such candidates, like those running independently of a political party or organization, must go to the voters directly, and draw from them some "modicum of support," as evidenced through their signatures on nomination papers. See *Jenness* v. *Fortson*, 403 U.S. 431, 442 (1971). The candidates' names,

---

[20]For this reason, we also reject the plaintiffs' claim that the phrase "in the same manner" refers to the internal processes through which a minor party selects its candidates for office. Minor parties and political organizations do not "make" a nomination in Massachusetts through their internal indorsement of a candidate; this formality does not occur until nomination papers, which have been signed by 10,000 certified voters, are filed with the appropriate State officials.

then, are not placed on the ballot simply because the minor party or political organization they might represent indorses them; such a privilege is reserved for candidates of recognized political parties, which have demonstrated a "measurable quantum of community support" by their performance in the preceding biennial election. See *American Party of Tex.* v. *White*, 415 U.S. 767, 782 (1974) (*White*). Consequently, we decline to read into § 14 a legislative intent at odds with the processes delineated elsewhere in the statutory scheme.[21] See *D'Avella* v. *McGonigle*, 429 Mass. 820, 822-823 (1999), quoting *Boston Neighborhood Taxi Ass'n* v. *Department of Pub. Utils.*, 410 Mass. 686, 690 (1991) ("Where the language of a statute is plain, it is 'the sole function of the courts . . . to enforce it according to its terms' ").

3. *Article 9.* Notwithstanding the imprecisions it identified in § 14, the First Circuit proceeded to examine — and reject — the plaintiffs' claim under the equal protection clause that, by refusing to allow substitution of minor party presidential and vice-presidential candidates, "the Secretary discriminates arbitrarily between recognized political parties and [minor parties or political organizations]." *Barr III, supra* at 108-111. The plaintiffs now bring a more generalized claim of constitutional violation under art. 9,[22] which they contend affords the citizenry broader ballot access protections than does the Federal equal protection clause. The Secretary, in turn, argues that this court has interpreted the State and Federal provisions coextensively, such that we should conclude that art. 9, like its Federal counterpart, does not require the "substitution" the plaintiffs seek.

[21]This is particularly so where the Legislature has provided an alternative means of substitution for a single class of candidates nominated by nomination papers — those entering the gubernatorial election. As provided by statute, candidates for Governor and Lieutenant Governor must include on their nomination papers (before any voters sign them) the names of five individuals who will form a committee and replace either candidate, if a vacancy should arise. See G. L. c. 53, §§ 6, 14. By requiring that these individuals be listed on the nomination papers themselves, the Legislature has ensured that the voters signing the papers not only are offering their support for the designated candidates and the five-member committee, but also are acquiescing to any replacements that committee may select.

[22]Article 9 of the Massachusetts Declaration of Rights states: "All elections ought to be free; and all the inhabitants of this Commonwealth, having such qualifications as they shall establish by their frame of government, have an equal right to elect officers, and to be elected, for public employments."

a. *Interpretation relative to the Federal Constitution.* As an initial matter, we agree with the Secretary that, in this context, art. 9 does not extend any protections beyond the Federal constitutional requirements. We, therefore, reject the plaintiffs' suggestion that our holding in *Batchelder* v. *Allied Stores Int'l, Inc.,* 388 Mass. 83 (1983), is somehow dispositive of the issue at hand. There, we decided that art. 9, unlike the First and Fourteenth Amendments, guaranteed a candidate's right to solicit signatures for his nomination in a privately owned shopping center. *Id.* at 87-93. In doing so, we relied, in large measure, on differences in the language of art. 9, which does not require State action, and that of the First and Fourteenth Amendments, which do.[23] *Id.* at 88-90. See *Commonwealth* v. *Upton,* 394 Mass. 363, 372 (1985). We did not enlarge generally the scope of ballot access rights protected under art. 9 vis-à-vis the Federal Constitution, and significantly, we have not done so in other cases. Indeed, in every other context where this issue has arisen, we have treated the State and Federal constitutional safeguards in the same manner, leaving for another day "the question whether the art. 9 standard diverges in any way from equal protection." *Bachrach* v. *Secretary of the Commonwealth,* 382 Mass. 268, 273-274 n.12 (1981). See, e.g., *Metros* v. *Secretary of the Commonwealth,* 396 Mass. 156, 163 (1985); *Langone* v. *Secretary of the Commonwealth,* 388 Mass. 185, 199-200 (1983), appeal dismissed sub nom. *Bellotti* v. *Connolly,* 460 U.S. 1057 (1983). Cf. *Moore* v. *Election Comm'rs of Cambridge,* 309 Mass. 303, 335 (1941) (concluding that analysis under State Constitution, including art. 9, sufficient to "dispose of" contentions under Federal Constitution).

As our decisions in *Batchelder* v. *Allied Stores Int'l, Inc., supra,* and the cases cited imply, we have the inherent authority "to interpret state constitutional provisions to accord greater protection to individual rights than do similar provisions of the United States Constitution." *Goodridge* v. *Department of Pub. Health,* 440 Mass. 309, 328 (2003), quoting *Arizona* v. *Evans,*

---

[23]We also discussed decisions from other State courts that had recognized "rights under State Constitutions to engage in orderly free speech, free assembly, or electoral activity on private property held open to the public." *Batchelder* v. *Allied Stores Int'l, Inc.,* 388 Mass. 83, 90 (1983).

514 U.S. 1, 8 (1995). But the mere existence of that authority does not require us to exercise it at every turn. In arguing that we should do so here, the plaintiffs primarily rely on our historic invocation of it, and offer scant justification unique to ballot access guarantees to support heightening protections of them under our State Constitution.[24] Cf. *Commonwealth* v. *Clarke*, 461 Mass. 336, 346-351 (2012) (examining text, history, and prior interpretations of Massachusetts constitutional right against self-incrimination to determine that art. 12 of Massachusetts Declaration of Rights provides more stringent protections for invoking right to silence than does Fifth Amendment to United States Constitution). They, in essence, offer "no separate reasons, and we are unaware of any, to conclude that the Massachusetts Constitution affords them protection not provided by . . . the United States Constitution." *Metros* v. *Secretary of the Commonwealth, supra,* quoting *Langone* v. *Secretary of the Commonwealth, supra* at 199.

b. *Application.* Given our conclusion regarding the scope of protections under art. 9, we assess the plaintiffs' constitutional claims within the familiar territory charted by the First Circuit.

---

[24]The plaintiffs do append a short argument on the purported "legislative history" of the Massachusetts Constitution, crafted exclusively around a statement from its author, John Adams, in which he expresses an apprehension of a two-party system. Letter to Jonathan Jackson, October 2, 1780, reprinted in 9 Works of John Adams 510-511 (C.F. Adams ed. 1864). This passage, however, is not the conclusive historical foothold the plaintiffs hope it to be, as reflections on the role of political parties (or "factions") frequently entered the public discourse regarding the growth of the Federal government as well. See Letter to Francis Hopkinson, March 13, 1789, reprinted in 5 Writings of Thomas Jefferson 75-76 (P.L. Ford ed. 1895); The Federalist No. 9 (Alexander Hamilton), No. 10 (James Madison); Farewell Address of George Washington, Sept. 17, 1796, reprinted in Addresses and Messages of the Presidents of the United States 59 (1839).

In any event, modern Federal case law concerning the rights of minor parties has incorporated some measure of sensitivity toward their cause, thereby suggesting that the analysis under the Federal Constitution does touch on the substance of Adams's concern. See, e.g., *Anderson* v. *Celebrezze*, 460 U.S. 780, 791-793 (1983) (recognizing vital role minor parties and other political organizations play in American politics and deeming unconstitutional Ohio statute requiring independent candidates for presidency to file statement of candidacy and nomination petitions in March of election year); *Williams* v. *Rhodes*, 393 U.S. 23, 31 (1968) ("the right to vote is heavily burdened if that vote may be cast only for one of two parties at a time when other parties are clamoring for a place on the ballot").

"Candidates for political office enjoy both a . . . right to participate equally in the electoral process and [to] associate with one another to achieve policy goals." *Barr* v. *Ireland*, 575 F. Supp. 2d 747, 755 (S.D. W. Va. 2008) (*Ireland*), citing *Burdick* v. *Takushi*, 504 U.S. 428, 433 (1992). See *Anderson* v. *Celebrezze*, 460 U.S. 780, 787-788 (1983). In theory and in practice, these rights intertwine with those of voters "to associate with one another and cast their ballots as they see fit." *Ireland, supra,* citing *Williams* v. *Rhodes*, 393 U.S. 23, 30 (1968). See *Bullock* v. *Carter*, 405 U.S. 134, 143 (1972) ("the rights of voters and the rights of candidates do not lend themselves to neat separation").

While these rights are fundamental, they — and the general principles to which they attach — do not amount to "an open sesame for minor parties and individuals who want to appear on the ballot with the major [party] candidates." *Ireland, supra,* quoting *Socialist Workers Party* v. *Hechler*, 890 F.2d 1303, 1304 (4th Cir. 1989). Rather, they stand as foils to a State's entrenched authority to regulate elections, a practical necessity to ensure that our democratic processes remain fair, honest, and orderly. See *Storer* v. *Brown*, 415 U.S. 724, 730 (1974). Thus, to evaluate the constitutionality of State ballot access regimes, the United States Supreme Court has developed a "sliding scale" approach, see *id.,* through which courts "weigh the 'character and magnitude' of the burden the State's rule imposes on [the plaintiffs'] rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." *Timmons* v. *Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (*Timmons*), quoting *Burdick* v. *Takushi, supra* at 434. "Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens . . . trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.' " *Timmons, supra,* quoting *Burdick* v. *Takushi, supra.*

Here, the burdens the plaintiffs allege are twofold, and, it appears, framed differently than those asserted before the First Circuit. First, the plaintiffs contend that, absent a mechanism to

"substitut[e]" the names of the presidential and vice-presidential candidates listed on nomination papers in Massachusetts for those indorsed at a national Libertarian nominating convention, the statutory scheme forces minor parties into the unfortunate position of selecting their nominees before the date on which nomination papers are released (typically, in February of a presidential election year), or waiting to do so until later in the election cycle, thereby depriving them of the full amount of time to collect signatures. Second, they contend, the absence of a substitution mechanism may impede the voting rights of qualified citizens who support a minor party. To this end, the plaintiffs elaborate on two scenarios, positing that (1) if the nationally indorsed candidates are not placed on the ballot, their supporters must resort to the "write-in" ballot, see G. L. c. 54, § 42; and (2) if the candidates nominated through nomination papers who do not earn the national indorsement are listed on the ballot alongside a minor party designation, voters may mistakenly believe that those candidates are "the minor party's chosen candidates."

To some extent, these burdens are significant. "But they cannot be considered in a vacuum." *Ireland, supra* at 756. That is, while the plaintiffs accentuate the dire consequences of a perceived tear in the statutory fabric (i.e., the absence of a "substitution mechanism"), we are obligated to step back and contemplate the cumulative effect of the legislative tapestry. See *Libertarian Party of Wash.* v. *Munro*, 31 F.3d 759, 761-762 (9th Cir. 1994) (*Munro*) (examining "entire scheme regulating ballot access" where minor party challenged specific provision that granted major, but not minor, parties second opportunity to place candidates on ballot after filing deadline had passed). In doing so, we ask whether "the challenged laws 'freeze' the status quo by effectively barring all candidates other than those of the major parties," *Manifold* v. *Blunt*, 863 F.2d 1368, 1374 (8th Cir. 1988), cert. denied, 493 U.S. 893 (1989), quoting *Jenness* v. *Fortson*, 403 U.S. 431, 439 (1971), or "whether 'reasonably diligent' minor party candidates can normally gain a place on the ballot." *Munro, supra* at 762, quoting *Storer* v. *Brown, supra* at 742.

When viewed in this context, the plaintiffs' purported right of

"substitution" loses what little theoretical traction it might have had when scrutinized on its own. As the First Circuit aptly noted, "[t]he Massachusetts ballot access provisions at issue here are nondiscriminatory," *Barr III, supra* at 109, and extend to all classes of candidates an "equality of opportunity." *Id.* at 110, quoting *Werme* v. *Merrill*, 84 F.3d 479, 485 (1st Cir. 1996). The laws subject "all political organizations . . . to the same criteria for determining whether they qualify for recognition as political parties," *Barr III, supra* at 109; G. L. c. 50, § 1, and extend to all organizations unable to attain or maintain that status (as well as to candidates unaffiliated with a political party or organization) an alternate route to the ballot. G. L. c. 53, § 6. These provisions are not inherently unconstitutional, see *Libertarian Party of Me.* v. *Dunlap*, 659 F. Supp. 2d 215, 222 (D. Me. 2009) (*Dunlap*), quoting *Jenness* v. *Fortson, supra* at 442 (differentiation among candidates permissible to ensure "some preliminary showing of a significant modicum of support" before printing candidate's name on ballot), nor are they unduly burdensome for candidates unaffiliated with the recognized political parties. See *Manifold* v. *Blunt, supra* at 1374-1375. Indeed, as the facts of this case reveal, the LAM has secured party status in the past by garnering the requisite number of votes at a qualifying election, see note 13, *supra*, and candidates affiliated with the association have succeeded in satisfying the ballot access procedures of § 6. See *Manifold* v. *Blunt, supra*, citing *White, supra* at 783-784 (ability of minor parties to fulfil ballot access requirements "demonstrates lack of burdensomeness").

Where a ballot access regime is otherwise open and accessible to minor parties and their candidates, Federal courts have rejected claims akin to the one presented here. See *Munro, supra* at 761-762; *Libertarian Party of N.H.* v. *Gardner*, 759 F. Supp. 2d 215, 223-226 (D.N.H. 2010) (*Gardner I*), aff'd, 638 F.3d 6 (1st Cir.) (*Gardner II*), cert. denied, 132 S. Ct. 402 (2011). For example, the United States Court of Appeals for the Ninth Circuit has rebuffed a challenge to a particular State election law that, by granting major, but not minor, parties a "second opportunity" to field a candidate after the filing deadline had passed, forced minor parties to hold their nominating conven-

tions relatively early in the election cycle. *Munro, supra* at 760-761, 766. Similarly, the United States District Court for the District of New Hampshire has denied a challenge (also arising from the 2008 presidential election) to a set of election laws that did not provide a means by which a minor party could replace a candidate running under its political designation. See *Gardner I, supra.* Notably, in this latter example, the Libertarian Party of New Hampshire framed its claim as a purported "right to substitute candidacies in appropriate situations," namely, the situation presented here, in which one set of "Libertarian" candidates (Phillies and Bennett) lost the national party indorsement to another (Barr and Root).[25] *Id.* at 221-222. The District Court derided this construct as a "euphemism for a purported 'right to remove' the names of candidates from the ballot who were legally entitled to be on the ballot," *id.* at 222, and opined that the plaintiffs had "fail[ed] to justify the relief sought by demonstrating how the statutory scheme that got both Phillies/Bennett and Root/Barr on the ballot as Libertarian Party candidates is unconstitutional." *Id.* at 223.

While similar in kind to the right their brethren sought in New Hampshire, the novel right the plaintiffs ask us to recognize is better described as a right (seemingly, in the absolute) for a minor party itself to qualify for ballot access. As the plaintiffs must view it (but do not argue), the signatures collected on behalf of one pair of candidates bearing the "Libertarian" designation must signal the voters' support for the minor party, rather than the candidates. Only then could the plaintiffs argue that they are entitled to transfer those signatures from one slate of candidates to another.

While there is no doubt some truth to this underlying contention, the concept is at odds with our statutory regime. Political organizations *themselves* only warrant deference, and only are entitled to direct access to the ballot, where they have satisfied the requirements for recognition as a "[p]olitical party." G. L.

---

[25] In contrast to their strategy in Massachusetts, both sets of candidates — George Phillies and Chris Bennett, and Bob Barr and Wayne Root — collected the requisite number of signatures to attain ballot access in New Hampshire. *Libertarian Party of N.H.* v. *Gardner*, 638 F.3d 6, 10 (1st Cir.), cert. denied, 132 S. Ct. 402 (2011) (*Gardner II*).

c. 50, § 1. Where a political organization is unable to meet this threshold, a candidate representing it must make use of the signature-gathering procedures of § 6. To allow the plaintiffs to transfer the signatures gathered in support of one slate of candidates bearing the "Libertarian" political designation for another indorsed at their national convention would subvert this scheme. It would, in essence, elevate the "political designation" listed on the nomination papers above the candidates named therein, thereby propelling the minor party to something akin to a "political party," even where that minor party has not otherwise attained party status through the statutorily prescribed processes. It also would free the nationally indorsed candidates from having to establish any presence in the Commonwealth, even where the alternate ballot access procedures are free and open to all. No constitutional edict requires this level of contortion. See *Burdick* v. *Takushi*, 504 U.S. 428, 440 n.10 (1992) ("limiting the choice of candidates to those who have complied with state election law requirements is the prototypical example of a regulation that . . . is eminently reasonable").

Finally, although we reject the plaintiffs' overarching assertion of a constitutional "right of substitution," we nonetheless examine the ballot access regime to determine whether it unduly burdens the plaintiffs' recognized rights in the manner described above.[26] Cf. *Anderson* v. *Firestone*, 499 F. Supp. 1027 (N.D. Fla. 1980) (unconstitutional to prevent independent presidential

---

[26]Here, we note that the plaintiffs offer two cursory arguments in the margins of their brief. First, they claim that a statutory framework that prohibits substitution infringes on the "right to associate with the political party of one's choice," which encompasses "a political party's substantial interest in ensuring . . . who will appear on a general election ballot as that party's candidate." *Langone* v. *Secretary of the Commonwealth*, 388 Mass. 185, 190, appeal dismissed sub nom. *Bellotti* v. *Connolly*, 460 U.S. 1057 (1983), citing *Opinion of the Justices*, 385 Mass. 1201, 1204 (1982). Second, they assert that, by granting a right to substitute candidates for Governor and for city or town office, § 14 poses an undue burden on presidential and vice-presidential candidates vis-à-vis candidates for nonpresidential office. On the surface, neither of these arguments appears persuasive. See *Libertarian Party of N.H.* v. *Gardner*, 759 F. Supp. 2d 215, 223-226 (D.N.H. 2010), aff'd, 638 F.3d 6 (1st Cir.), cert. denied, 132 S. Ct. 402 (2011) (rejecting Libertarian Party's analogous "right to substitute" and corresponding political association arguments against New Hampshire ballot access regime); *Libertarian Party of Me.* v. *Dunlap*, 659 F. Supp. 2d 215, 223 (D. Me. 2009), quoting *Anderson* v. *Quinn*, 495 F. Supp. 730, 733 (D. Me. 1980) (rejecting Libertarian Party's

candidate from substituting name of running mate listed on nomination papers where State election laws requiring independent candidates to name running mates far earlier than majority party candidates found discriminatory). Of primary concern is the plaintiffs' claim that the statutory regime imposes on them an unconstitutional dilemma, in which they must select their candidates early in the election cycle or lose some amount of time to collect signatures.

The election laws prescribe the time period in which minor party candidates, as well as those unaffiliated with any political party or organization, must gather the requisite number of signatures from registered Massachusetts voters, and the dates on which those signatures must be filed with local election officials and the Secretary. G. L. c. 53, §§ 6-9. They are silent on the inner workings of minor parties themselves, and thus, it remains the prerogative of those minor parties, the plaintiffs included, to select a nationally indorsed candidate (for whom they may then collect signatures in Massachusetts) at any time, and in any manner, they see fit. See *Dunlap, supra* at 220 n.5 ("whatever the date the Libertarian Party chose, it was its decision and the Party is in an awkward position to complain that its decision shortened the time within which it could collect signatures"). That, in some cases, a minor party may have to think ahead to ensure that its candidate will receive the benefit of the full period allowed to collect signatures, or else fall within the restraints of a self-imposed abbreviated time frame, does not impose a significant burden. Cf. *McClure* v. *Galvin*, 386 F.3d 36, 42 (1st Cir. 2004) (*Storer* v. *Brown, supra* at 734, "held that a potential candidate was not significantly burdened by a statute that forced him to think ahead one full year before becoming an independent candidate").

On this point, we find instructive Federal court decisions

claim of disparate treatment between candidates for presidential office and candidates for nonpresidential office because "the critical comparison is between 'candidates for the same office, not with candidates for other offices who are elected through a different process' "). Regardless, given the paucity of these arguments, the second being proffered without any supporting citation, we do not consider them. See *Powers* v. *Secretary of Admin.*, 412 Mass. 119, 130 (1992) (declining to consider due process argument where "cursory presentation [of argument] fails to meet the basic requirements for appellate argument").

concerning the timing constraints imposed on candidates representing a minor party and those running independently relative to their counterparts from recognized political parties. See, e.g., *Anderson* v. *Celebrezze,* 460 U.S. 780, 790-796 (1983); *Dunlap, supra* 221-223 & nn.7, 8. Under one line of cases, such courts have considered the validity of deadlines for declaring and perfecting a minor party candidacy set farther from the date of the general election than those for major party candidacies. See, e.g., *Libertarian Party of Fla.* v. *State,* 710 F.2d 790, 793 (11th Cir. 1983), cert. denied, 469 U.S. 831 (1984), and cases cited. While acknowledging that filing deadlines set in the winter or spring preceding the election effectively may preclude the full participation of minor parties by rendering them inflexible to changes in the political climate, *Anderson* v. *Celebrezze, supra* at 790-791, Federal courts readily have accepted a deadline set within ninety days of the general election. See *Cromer* v. *State,* 917 F.2d 819, 825 (4th Cir. 1990). See also *Dunlap, supra.* Relatedly, the United States Supreme Court has examined the reasonableness of the time period in which a candidate could be expected to collect signatures. *White, supra* at 786-787. *Storer* v. *Brown, supra* at 738-740. In this regard, the Court has opined that an election law requiring candidates unaffiliated with a recognized political party to collect signatures at a pace of 13,542 per day for twenty-four days did not appear excessive, *id.* at 738, 740,[27] and similarly concluded that a fifty-five day period to secure 22,000 signatures was not "unduly short." *White, supra* at 786.

By comparison, in 2008, a candidate retrieving nomination papers on the first day they were available, February 6, would have had until July 29 (approximately 176 days) to gather the 10,000 signatures required to qualify for the ballot. From the day George Phillies contacted the Secretary's office regarding the national party's indorsement of Barr and Root (May 29), the plaintiffs would have had sixty days until the deadline. That is,

---

[27]In *Storer* v. *Brown,* 415 U.S. 724, 740 (1974), the United States Supreme Court ultimately remanded the matter to the Federal District Court to evaluate whether "the available pool [of voters] is so diminished in size by the disqualification of those who voted in the primary that the 325,000-signature requirement, to be satisfied in 24 days, is too great a burden on the independent candidates for the offices of President and Vice President."

they would have had to gather approximately 170 signatures per day. Thus, the filing deadline and the wide berth of time permitted to collect a relatively low number of signatures provide flexibility sufficient to comport with the constitutional minimums, and in no way "freeze[] the status quo."[28]

Given these modest burdens imposed on the plaintiffs, we agree with the First Circuit's conclusion that "there need be only a rational basis undergirding the regulation in order for it to pass constitutional muster," *Barr III, supra* at 110, citing *Timmons, supra* at 358-359, a threshold that § 14 easily meets. As the First Circuit noted, the State's "interest in ensuring that a candidate makes a preliminary showing of a substantial measure of support [before] appearing on the ballot" is legitimate. *Barr III, supra* at 111. Although this interest is discernibly less weighty in the context of presidential elections, in which "the outcome . . . will be largely determined by voters beyond the State's boundaries," *Anderson* v. *Celebrezze, supra* at 795, it is not so diminished as to be impotent against the minimal burdens imposed on the plaintiffs.[29]

---

[28]We address the plaintiffs' claims regarding voting rights, which they offer without any supporting case law, only briefly.

Even assuming that minor parties have "some interest in preventing voter confusion of [their] nominated candidates with other candidates who also espouse Libertarian ideals," *Gardner II, supra* at 16, the plaintiffs have offered no evidence supporting their bald assertion that a substitution mechanism is vital to circumventing this concern. See *id.*, quoting *Washington State Grange* v. *Washington State Republican Party*, 552 U.S. 442, 454 (2008) (rejecting presumption that "a well-informed electorate will interpret a candidate's party-preference designation to mean that the candidate is the party's chosen nominee or representative or that the party associates with or approves of the candidate"). Moreover, although we recognize that the opportunity to "write in" the name of a candidate is not an ideal substitute for having the candidate's name printed on the ballot where restrictive access provisions are in place, see *Anderson* v. *Celebrezze*, 460 U.S. 780, 799 n.26 (1983), it is an alternative in the circumstances presented here, where a candidate, by his own volition, wholly failed to qualify for ballot access. G. L. c. 54, § 42. See *Metros* v. *Secretary of the Commonwealth*, 396 Mass. 156, 161 (1985) (finding no violation of right to vote, and positing that voter could write in candidate's name, where candidate did not satisfy disqualification provision).

[29]This is particularly evident where, as here, the State's asserted interest is not a pretext for insulating any entrenched political parties, see *Anderson* v. *Celebrezze, supra* at 801-802, but, rather, a measured and reasonable attempt to regulate elections. See *Timmons* v. *Twin Cities Area New Party*, 520 U.S.

At the core of this case lies a simple fact the plaintiffs choose to ignore: even after receiving the national indorsement of the Libertarian Party, Barr and Root made no effort to qualify themselves for ballot access in Massachusetts. They merely expected the Secretary to extrapolate from the signatures gathered on behalf of the Phillies and Bennett ticket a generalized support for the "Libertarian" political designation, which could then be applied to them. But the election laws do not — and, under the Constitution, need not — extend such a privilege to minor parties where a statutory mechanism exists through which they can demonstrate the generalized support necessary to obtain that privilege: that is, by becoming a recognized political party. The LAM has attained this status in the past and may do so again in the future. In the meantime, however, it and each of its candidates must adhere to the statutorily prescribed processes for gaining access to the ballot: they must go to the people of Massachusetts and request from them their support, as evidenced by their signatures on nomination papers. Whether another alternative, one designed specifically for minor parties or other political organizations that permits them to control — and to substitute — candidates bearing their political designation, would be a prudent policy choice is not for us to decide.

*Conclusion.* The matter is remanded to the county court, where the single justice will enter a declaratory judgment consistent with this opinion.

*So ordered.*

---

351, 364 (1997), citing *Bullock* v. *Carter*, 405 U.S. 134, 145 (1972) ("States certainly have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes as means for electing public officials"); *American Party of Tex.* v. *White*, 415 U.S. 767, 782-783 (1974) ("[s]o long as the larger parties must demonstrate major support among the electorate at the last election, whereas the smaller parties need not, the latter, without being invidiously treated, may be required to establish their position in some other manner").