NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12931

 ROBERT GOLDSTEIN[1] & others[2]  vs.  SECRETARY OF THE COMMONWEALTH.


        Suffolk.     April 16, 2020. - April 17, 2020.

     Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher,
                     & Kafker, JJ.


Elections, Ballot, Validity of nomination papers.  Secretary of
     the Commonwealth.  Constitutional Law, Elections.



     Civil action commenced in the Supreme Judicial Court for
the county of Suffolk on April 8, 2020.

     The case was reported by Cypher, J.


     Robert G. Jones for the plaintiffs.
     Anne Sterman, Assistant Attorney General, for the
defendant.
     Thomas O. Bean & James D. Henderson, for Ranked Choice
Voting 2020 Committee, amicus curiae, submitted a brief.


     GANTS, C.J.  On April 8, 2020, the plaintiffs, each of whom

seeks to be a candidate for elective office in the primary

---

     [1] On behalf of himself and others similarly situated.

     [2] Kevin O'Connor and Melissa Bower Smith, on behalf of
themselves and others similarly situated.

election scheduled for September 1, 2020, brought an emergency petition in the county court, seeking relief under G. L. c. 214, § 1, and G. L. c. 231A, § 1. They requested a declaration that, in light of the emergency circumstances arising from the COVID-19 pandemic, the signature requirements in G. L. c. 53, §§ 7 and 44 (minimum signature requirements), to be listed on the ballot for a party's nomination pose an "unconstitutionally severe burden on the fundamental rights" of all Massachusetts would-be candidates. They seek, by means of this declaration, to eliminate the minimum signature requirements for the September 1 primary election. In the alternative, they asked for various forms of equitable relief, such as substantially reducing the number of required signatures of certified voters, extending the applicable filing deadlines, and permitting electronic signatures, as a means of remedying the constitutional violation. A single justice of this court reserved and reported this petition to the full court.

The plaintiffs do not contend that the minimum signature requirements in §§ 7 and 44 are facially unconstitutional; that is, they do not contend that these requirements unduly burden the constitutional right of a candidate to seek elective office in ordinary times. Rather, they contend that these requirements, when applied in these extraordinary times of a declared state of emergency arising from the COVID-19 pandemic,

create an undue burden on a prospective candidate's constitutional right to seek elective office.

The Secretary of the Commonwealth (Secretary) agrees that, "as a practical matter, application of the signature requirements in the context of the current public health crisis imposes a greater than usual burden on [the plaintiffs], triggering heightened scrutiny." The Secretary also agrees that, in this time of pandemic, the justification for the current signature requirements cannot survive this scrutiny, and that this court must craft a remedy for this constitutional violation. We also agree, and fashion equitable relief intended to substantially diminish that burden, while respecting the legislative purpose for imposing minimum signature requirements.

In short, for all candidates seeking to appear on the State primary ballot on September 1, we order three forms of relief. First, we order that the number of required signatures be reduced by fifty percent (50%). Second, we extend the deadlines for candidates running for State district and county offices to submit their nomination papers to local election officials for certification and for the filing of certified nomination papers with the Secretary to May 5, 2020, and June 2, 2020, respectively, which are the current due dates for party candidates running for Federal and Statewide offices. Third, subject to the restrictions outlined later in this opinion, we

order the Secretary to allow the submission and filing of nomination papers with electronic rather than wet-ink original signatures ("wet" signatures).  We emphasize that the declaration we make and the equitable relief we provide is limited to the primary election in these extraordinary circumstances, which is the sole subject of the case before us, and does not affect the minimum signature requirements for the general election this year or for the primary elections in any other year.[3]

Background.  1.  Ballot access.  This year, 2020, is an election year in Massachusetts for certain Federal,[4] State,[5] and county offices.[6]  The State primary election, in which candidates

---

[3] We acknowledge the amicus letter submitted by the Ranked Choice Voting 2020 Committee.

[4] Federal offices include electors of President and Vice-President, United States senator (the seat currently held by Senator Edward Markey), and United States representative (all nine districts).  See Secretary of the Commonwealth, A Candidate's Guide to the 2020 State Election, at 5 (rev. Feb. 2020) (2020 Candidate's Guide).

[5] Statewide offices include executive councilor (all eight districts), State senator (all forty districts), and State representative (all 160 districts).  See 2020 Candidate's Guide, supra.

[6] County offices include the register of probate (Barnstable, Bristol, Dukes, Norfolk, and Plymouth Counties only), county commissioner (same), county treasurer (Bristol, Dukes, Norfolk, and Plymouth Counties only), council of government executive committee (Franklin County only), and sheriff (Norfolk County only).  See 2020 Candidate's Guide, supra.

5

affiliated with the various political parties (Democratic, Green-Rainbow, Libertarian, and Republican) are nominated to run for the offices at issue, is currently scheduled for September 1, 2020. See Secretary of the Commonwealth, A Candidate's Guide to the 2020 State Election, at 5 (rev. Feb. 2020) (2020 Candidate's Guide). The general election, in which the party nominees will compete against one another as well as against any nonparty candidates for the offices on the ballot, is scheduled for November 3, 2020. See id.

The three plaintiffs aspire to appear on the State primary election ballot in September in an effort to secure their respective party's nominations for three different Federal and State offices. Robert Goldstein seeks to be the Democratic Party's nominee for the office of United States representative for the Eighth Congressional District in Massachusetts. Kevin O'Connor seeks the Republican Party's nomination for the office of United States senator. Melissa Bower Smith aspires to be the Democratic Party's nominee for the office of State representative for the Fourth Norfolk District.

a. Minimum signature requirements. To appear on the ballot, candidates like the plaintiffs are required by statute to, among other things, submit nomination papers containing a

minimum number of certified voter signatures.[7]  See G. L. c. 53,
§ 44.  The number of certified signatures required differs
depending on the office the candidate is seeking.  Id.  For
example, a candidate like O'Connor, seeking election as a United
States senator, must secure 10,000 certified voter signatures.
Id.  A candidate like Goldstein, seeking election as a
representative to the United States Congress, requires 2,000.
Id.  And a candidate seeking election as a State representative,
like Smith, must obtain 150.  Id.[8]

   b.  Certified signatures.  To qualify as "certified," a
signature must be of a voter registered in the geographic area
corresponding to the office for which the candidate is seeking
nomination.  See G. L. c. 53, § 7.  In addition, if the
candidate is seeking the nomination of a particular political

---

[7] Candidates for Federal and Statewide offices who are not
affiliated with a party also must satisfy certain minimum
signature requirements to appear on the general election ballot
in November.  The deadlines for the submission and filing of
their nomination papers, however, do not expire until July 28
and August 25, 2020.  See 2020 Candidate's Guide, supra at 6-9.
Federal and Statewide nonparty candidates, therefore, are not
similarly situated to the plaintiffs.  Nor has anyone appeared
in this action and challenged the signature requirements and
deadlines for nonparty candidates for Federal or Statewide
offices.  Therefore, we do not address the constitutionality of
those requirements and deadlines.

[8] The number of certified voter signatures required for the
other offices at issue in the upcoming State primary election
are as follows:  Executive councilor, 1,000; State senator, 300;
Barnstable and Franklin County offices, 500; and all other
county offices, 1,000.  See G. L. c. 53, § 44.

party, as is the case with the plaintiffs, the voter must be registered with the same party or as "unenrolled," meaning registered to vote, but with no party affiliation.[9]  See G. L. c. 53, § 37; 2020 Candidate's Guide, supra at 13.  Accordingly, for a candidate like O'Connor, seeking the Republican Party nomination for United States senator, a Statewide office, signatures may be secured from voters registered anywhere in Massachusetts as either Republicans or unenrolled.  For a candidate like Goldstein or Smith, seeking the Democratic Party nomination to represent a specific district in Massachusetts, the signatures must be from voters registered in that district as either Democrats or unenrolled.

c.  Nomination papers.  The process for obtaining and certifying the required number of signatures commences when the Secretary prepares the nomination papers and furnishes them to candidates.  See G. L. c. 53, § 47.  This year, the nomination papers were furnished on February 11, 2020.[10]  Before obtaining any signatures, candidates must fill in the top of the nomination papers with certain information, including their

---

[9] Unenrolled voters are commonly referred to as "Independents."  See 2020 Candidate's Guide, supra at 4.

[10] The Secretary is required to furnish the nomination papers on or before the fifteenth Tuesday preceding the deadline established in G. L. c. 53, § 48, for filing certified nomination papers.  See G. L. c. 53, § 47.

name, address, and party affiliation (if any), and the office they are pursuing.  See G. L. c. 53, § 8.  The candidates, or others working on their behalf, must then gather voter signatures on the nomination papers or on "exact copies" of such forms.  See G. L. c. 53, § 17.  Voters are required to sign the nomination papers "in person as registered or substantially as registered" (emphasis added).  G. L. c. 53, § 7.  The Secretary interprets this combination of requirements, that the voter sign "in person" on the original nomination papers or on "exact copies" thereof, to mean that the signatures eventually submitted and filed must be original handwritten or "wet" signatures.  However, "any voter who is prevented by physical disability from writing may authorize some person to write his or her name and residence in his or her presence."  Id.  Voters also must indicate the address where they are currently registered on the nomination papers.  Id.

d.  Certification and filing deadlines.  The statutorily driven timeline that follows the receipt of the nomination papers from the Secretary has two major deadlines, which can differ depending on the office a candidate is pursuing.  The first is the deadline by which the candidate must submit the nomination papers to local election officials for certification. At least twenty-eight days before the deadline for the submission of the certified nomination papers to the Secretary,

the candidates must submit their nomination papers to local election officials in each city and town where the individuals who signed the papers are registered to vote.[11]  See G. L. c. 53, §§ 7, 46.  For a candidate like Smith, pursuing a seat as a State representative, this deadline falls on or before April 28, 2020.  For candidates like O'Connor and Goldstein, seeking Federal offices, this deadline falls on or before May 5, 2020.

Applying regulations promulgated by the Secretary, see 950 Code Mass. Regs. § 55.03(1) (2004),[12] local election officials then review each signature on the nomination papers.  See G. L. c. 53, §§ 7, 46.  Signatures can be disallowed for a variety of reasons, including that the voter is not registered at the address provided, the voter's name as signed does not match the voter's name as registered, the voter's signature or address is illegible, the voter is enrolled in the wrong party, or the voter's signature already appeared on the candidate's nominating papers.  See 950 Code Mass. Regs. § 55.03(1).  Due to the potential for the disallowance of numerous signatures, prudent candidates collect more signatures than are required, see 2020 Candidate's Guide, supra at 16 (encouraging candidates to do

---

[11] "Each nomination paper should contain signatures of registered voters from only ONE city or town."  2020 Candidate's Guide, supra at 16.

[12] The regulations were promulgated by the Secretary pursuant to authority granted in G. L. c. 53, § 7.

just that), and local election officials are required to certify two-fifths more signatures than are required to make the ballot, G. L. c. 53, § 7.  Local election officials are required to complete the certification process no later than the seventh day before the deadline for the submission of the papers to the Secretary.  G. L. c. 53, §§ 7, 46.  There then follows a short period for candidates to seek a review of disallowed signatures. See G. L. c. 55B, § 6.

The second major deadline, from which the first is calculated, is the date by which nomination papers certified by local election officials must then be filed with the Secretary. For candidates seeking election to State district and county offices, this deadline is on or before the last Tuesday in May of an election year, which, this year, means on or before May 26, 2020.  See G. L. c. 53, §§ 10, 48.  This is the deadline by which Smith, seeking election as a State representative, must file her certified nomination papers with the Secretary. Meanwhile, for candidates who are seeking election to Federal or Statewide offices, as are O'Connor and Goldstein, the deadline is on or before the first Tuesday in June, which, in this election year, is on or before June 2, 2020.  See G. L. c. 53, § 48.

e.  Objection process.  Registered voters from the district in which a candidate seeks nomination have three days from the

filing deadlines with the Secretary to file objections to nomination papers with the State Ballot Law Commission (SBLC). See G. L. c. 55B, § 5. The SBLC then has twenty-one days from the closure of the objection periods to render a decision on any objections. See G. L. c. 55B, § 10. Given the aforementioned filing deadlines with the Secretary, therefore, objections to nomination papers would have to be decided by the SBLC on or before June 19 and 26, 2020, as applicable.

f. Preparation of ballots. For any election in which a Federal office is at issue, Federal law mandates that ballots must be transmitted to military and overseas voters no later than forty-five days in advance of the election. See 52 U.S.C. § 20302(a)(8)(A). For the upcoming September 1 primary election, this means that local election officials must transmit the ballots to military and overseas voters by July 18. In turn, this means the Secretary's office may have as little as eighteen days from the June 26 SBLC decision deadline to the July 14 date when ballots must be in the hands of local election officials to prepare, proofread, and finalize the 2,200 different ballot styles required for the different jurisdictions in the Commonwealth. According to the Secretary's office, this timeline is already tight, since the process usually takes three weeks to complete.

2.  COVID-19 pandemic.  On March 10, 2020, the Governor declared a state of emergency throughout the Commonwealth in response to the spread of COVID-19, where he invoked his statutory authority to "from time to time issue recommendations, directives, and orders as circumstances may require."  See Executive Order No. 591.  The following day, the World Health Organization declared COVID-19 to be a global pandemic.  On March 15, 2020, the Governor issued orders closing all public and private elementary and secondary schools, prohibiting public and private gatherings of more than twenty-five people, and prohibiting the on-premises consumption of food and drink at restaurants, bars, and other food establishments.  Then, on March 23, 2020, he issued another executive order, further limiting public and private gatherings to no more than ten people and requiring all nonessential businesses to close their physical workplaces and facilities.  See COVID-19 Order No. 13.  See also COVID-19 Order No. 21.  At his direction, the Department of Public Health (DPH) issued a "Stay-at-Home Advisory" the following day, declaring that it was "critically important" for everybody to "[o]nly leave home for essential errands such as going to the grocery store or pharmacy," and that, when people do leave home, to "practice social distancing by staying [six] feet away from others."  DPH Public Health Advisory:  Stay-at-Home Advisory (Mar. 24, 2020).  On April 10,

DPH issued another advisory recommending that people wear face coverings or masks when social distancing is not possible.  See DPH Advisory Regarding Face Coverings and Cloth Masks (Apr. 10, 2020).  All of these restrictions on everyday life, which will remain in effect until at least May 4, 2020, have been imposed in an effort to mitigate the spread of the virus, which can occur at an alarming rate.  Even with these restrictions in place, as of April 16, 2020, there have been 32,141 confirmed cases of COVID-19 in Massachusetts, resulting in 1,245 deaths.  See Department of Public Health, Coronavirus Disease 2019 (COVID-19) Cases in MA, as of April 16, 2020, https://mass.gov /doc/covid-19-cases-in-massachusetts-as-of-april-16-2020 /download [https://perma.cc/FR75-PDFY].

With the onset of the pandemic and the imposition of restrictions that followed, the plaintiffs and other candidates could not safely and reasonably gather voter signatures in the usual ways, namely, going to places where large numbers of potential registered voters are likely to be, such as town centers, malls, grocery stores, or political meetings.  In the face of this predicament, the plaintiffs and other candidates wrote to the Secretary, seeking relief from the minimum signature requirements.  The Secretary, however, maintained that he lacked the authority to act, and that only the Governor and

Legislature could provide such relief.[13]  The Governor and
numerous legislators have expressed their willingness to
consider a legislative "fix" to the predicament, but bills that
were introduced in the Legislature that would reduce the number
of required signatures for those offices requiring 1,000 or more
signatures by fifty percent, see 2020 Senate Doc. No. 2632, or
by two-thirds for all offices, see 2020 House Doc. No. 4981.
The Senate has engrossed its bill, but, as of the time this
opinion was submitted, neither legislative "fix" had been
enacted.

Discussion.  The right to seek elected office, like the
related right to vote, is a fundamental constitutional right in
Massachusetts.  Article 9 of the Massachusetts Declaration of
Rights provides, with impressive brevity and clarity, that
"[a]ll elections ought to be free; and all the inhabitants of
this commonwealth, having such qualifications as they shall
establish by their frame of government, have an equal right to
elect officers, and to be elected, for public employments."

---

[13] The Secretary issued an advisory recommending, among
other things, that candidates and volunteers "take appropriate
precautions as they continue to gather signatures.  If you are
interacting with voters, be sure to have hand sanitizer or
disinfectant wipes available and wash your hands frequently.  If
possible, consider providing signers with fresh pens and sheets
of paper."  See Secretary of the Commonwealth, COVID-19
Elections Updates, https://www.sec.state.ma.us/ele/covid-
19/covid-19.htm [https://perma.cc/ZM2J-GBY8].

Over the ensuing 240 years since the adoption of our Declaration of Rights in 1780, art. 9 has served to protect the "fundamental" and "intertwine[d]" rights of candidates to gain access to the ballot and of voters to cast their ballots as they see fit. See Libertarian Ass'n of Mass. v. Secretary of the Commonwealth, 462 Mass. 538, 560 (2012) (LAM).

As with many fundamental rights, the "court has sustained statutes which reasonably regulate elections and access to a place on the ballot." Opinion of the Justices, 368 Mass. 819, 821-822 (1975). See Opinion of the Justices, 413 Mass. 1201, 1209 (1992), quoting Opinion of the Justices, 375 Mass. 795, 811 (1978) ("the right to be elected, preserved in art. 9, is not absolute but 'is subject to legislation reasonably necessary to achieve legitimate public objectives'"). In fact, the court has previously considered the same minimum signature requirements at issue here and concluded that they withstood constitutional scrutiny. LAM, 462 Mass. at 567. In that case, the plaintiff Libertarian party sought to transfer the certified voter signatures obtained by one candidate to another candidate in order to qualify the latter to be on the general election ballot. See id. at 545-546. The present case comes before the court under an entirely different set of facts and circumstances. The framework through which we analyze it, however, remains the same.

When we evaluate the constitutionality of a restriction on access to the ballot, we apply a "sliding scale approach, . . . through which [we] weigh the character and magnitude of the burden the State's rule imposes on the plaintiffs' rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary" (quotations, citations, and alterations omitted).  Id. at 560.  "Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest.  Lesser burdens . . . trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions" (quotations and citations omitted).  Id.  More recently, recognizing that the Massachusetts Declaration of Rights may be more protective of voting rights than the Federal Constitution, we have declared that we do not use the phrase "severe burden," which arises from Federal constitutional jurisprudence, in determining whether strict scrutiny applies but instead apply strict scrutiny to a voting requirement that "significantly interfere[s]" with the fundamental right to vote. See Chelsea Collaborative, Inc. v. Secretary of the Commonwealth, 480 Mass. 27, 35, 36 n.21, 40 (2018).  We need not decide here whether the Massachusetts Constitution provides greater protections for the art. 9 rights at issue, because it

is undisputed that, under the circumstances arising from this pandemic, we should apply strict scrutiny to the minimum signature requirements regardless of whether we apply a "severe burden" or "significant interference" formulation.

In ordinary times, the minimum signature requirements to appear on the ballot in Massachusetts only impose "modest burdens" on prospective candidates for public office, so "there need be only a rational basis undergirding the regulation in order for it to pass constitutional muster" (citation omitted). LAM, 462 Mass. at 567. And in ordinary times the rational basis threshold is "easily" met, as the "State's interest in ensuring that a candidate makes a preliminary showing of a substantial measure of support before appearing on the ballot is legitimate" (quotation, citation, and alteration omitted). Id. Minimum signature requirements ensure "that the candidates who appear on the . . . ballot have demonstrable support among the voting public." Barr v. Galvin, 626 F. 3d 99, 111 (1st Cir. 2010), cert. denied, 565 U.S. 929 (2011). In doing so, they "safeguard the integrity of elections by avoiding overloaded ballots and frivolous candidacies, which diminish victory margins, contribute to the cost of conducting elections, confuse and frustrate voters, increase the need for burdensome runoffs, and may ultimately discourage voter participation in the electoral

process."  Libertarian Party of Me. v. Diamond, 992 F.2d 365, 371 (1st Cir.), cert. denied, 510 U.S. 917 (1993).

But, as we have recognized, statutory requirements that were once considered constitutionally permissible may later be found to interfere significantly with a fundamental right as societal conditions and technology change.  See Chelsea Collaborative, Inc., 480 Mass. at 37, citing Goodridge v. Department of Pub. Health, 440 Mass. 309, 341 n.33 (2003).  And similarly, statutory requirements that in ordinary times impose only modest burdens on prospective candidates for public office may significantly interfere with the fundamental right to run for political office in a time of pandemic.

We need not dwell long on how dramatically conditions have changed in Massachusetts since the Governor first announced a state of emergency arising from the COVID-19 pandemic on March 10.  All who presently live in the Commonwealth have seen it (and lived it), and, for additional details, posterity can look to our recent decision in Committee for Pub. Counsel Servs. v. Chief Justice of the Trial Court, 484 Mass. 431, 433-434 (2020).  Suffice it to say that, during the state of emergency, the traditional venues for signature collection are unavailable: few people are walking on public streets in town centers; malls are closed, as are all but essential businesses; restaurants provide only take-out food or delivery; public meetings, if held

at all, are conducted virtually; and the vast majority of people are remaining at home.  See Glovsky v. Roche Bros. Supermkts., Inc., 469 Mass. 752, 762 (2014) (recognizing candidates' constitutional right to solicit nominating signatures outside entrance to supermarket); Batchelder v. Allied Stores Int'l, Inc., 388 Mass. 83, 92 (1983) ("a person needing signatures for ballot access requires personal contact with voters").

When people do encounter each other, they do so only by maintaining a "social distance" of at least six feet, and attempt to keep such encounters as brief as possible.  Because it has been shown that one can carry and spread the COVID-19 virus without any apparent symptoms, every encounter with another person, especially a stranger, poses a risk of infection.  Because it is not altogether clear how long the COVID-19 virus may "survive" on various surfaces and objects, people are reluctant to touch any pen or piece of paper that has been touched by another, at least unless they quickly can wash or sanitize their hands.  Accordingly, if a candidate seeks to obtain signatures on nomination papers in the traditional ways, he or she reasonably may fear that doing so might risk the health and safety not only of the person requesting the signature but also of the persons who are signing, of the families with whom they live, and potentially of their entire community.

In short, as the Secretary rightly and readily acknowledges, the minimum signature requirements, which may only impose a modest burden on candidates in ordinary times, now impose a severe burden on, or significant interference with, a candidate's right to gain access to the September 1 primary ballot, and the government has not advanced a compelling interest for why those same requirements should still apply under the present circumstances.  See LAM, 462 Mass. at 560.  Indeed, it concedes that there is none.  The minimum signature requirements, therefore, in this time of pandemic are unconstitutional as applied to the plaintiffs, and other similarly situated candidates.

If the Legislature had enacted a law on March 23 imposing harsh new requirements that made it substantially more difficult for candidates to obtain the required signatures to get on the September 1 primary ballot, we no doubt would declare the law unconstitutional.  The Legislature, of course, did not do this, but it is fair to say that the pandemic did.  To be sure, "wet" signatures can still be obtained, but the ability to do so safely has been greatly diminished or been made significantly more laborious.  No fair-minded person can dispute that the fundamental right to run for elective office has been unconstitutionally burdened or interfered with by the need to

obtain the required "wet" signatures in the midst of this pandemic. See LAM, 462 Mass. at 560.

The burdens imposed by the statutory minimum signature requirements are not inevitable. There are alternatives that could preserve the legislative purpose that a candidate demonstrate a certain level of support in order to win a place on the ballot and yet protect the public from the health risks associated with obtaining "wet" signatures.

As a general matter, the principle of separation of powers set forth in art. 30 of the Massachusetts Declaration of Rights prevents the "judiciary [from] substituting its notions of correct policy for that of a popularly elected Legislature" (citation omitted). Commonwealth v. Leno, 415 Mass. 835, 841 (1993). But where fundamental constitutional rights are violated, and where the Legislature fails to remedy the constitutional deficiencies after having had the opportunity to do so, and where an aggrieved litigant files suit seeking remedial relief for the constitutional violation, the judiciary must provide such a remedy. See Cepulonis v. Secretary of the Commonwealth, 389 Mass. 930, 938 (1983), citing Reynolds v. Sims, 377 U.S. 533, 586 (1964). Here, where the filing deadline for nomination papers fast approaches, and the Legislature has yet to take decisive action, we have little choice but to provide equitable relief, pursuant to G. L. c. 214, § 1, to

protect the constitutional rights of the plaintiffs and those similarly situated.  See Commonwealth v. United Food Corp., 374 Mass. 765, 781 (1978) ("In order to avoid the unconstitutional aspects of the statute, and to achieve the basic legislative purpose, we conclude that the judge must have discretion to fashion the judgment in this case . . .").  "It is a well settled principle that, in fashioning appropriate relief, the issuance and scope of equitable relief rests within the sound discretion" of the court.  Johnson v. Martignetti, 374 Mass. 784, 794 (1978), citing Martin v. Murphy, 216 Mass. 466, 468 (1914).  We recognize, though, that where these extraordinary circumstances require us to make policy judgments that, in ordinary times would be best left to the Legislature, our remedy must be "no more intrusive than it ought reasonably be to ensure the accomplishment of the legally justified result."  Perez v. Boston Hous. Auth., 379 Mass. 703, 730 (1980).[14]

---

[14] The action we take here is by no means unprecedented. Other States, addressing the potential for voter disenfranchisement in the face of natural disasters, have similarly provided narrowly tailored equitable relief to protect the constitutional rights of voters.  See, e.g., Florida Democratic Party v. Scott, 215 F. Supp. 3d 1250, 1257-1259 (N.D. Fla. 2016) (ordering Statewide extension of voter registration deadline in response to Hurricane Matthew); Georgia Coalition for the People's Agenda, Inc. v. Deal, 214 F. Supp. 3d 1344, 1345-1346 (S.D. Ga. 2016) (ordering extension of voter registration deadline for one county in response to Hurricane Matthew).  In addition, at least one court has declared minimum signature requirements to be unconstitutional in light of the pandemic and, as a result, reduced the numbers.  See Omari

The plaintiffs have requested various alternative forms of relief. Before we discuss the relief that is granted, we take a moment to address the requests for relief that we do not believe are justified.

The plaintiffs first request that we not only declare the minimum signature requirements unconstitutional as applied to them and similarly situated candidates during this primary election, but also declare the minimum signature requirements void. In effect, the plaintiffs seek to avoid the minimum signature requirements altogether and proceed directly to the September 1 primary ballot. We decline to order this remedy; the justification for the current statutorily prescribed signature requirements is outweighed by the burden those requirements impose under the present conditions, but there is still merit to having some signature requirements. Even in the midst of the pandemic, the State has a legitimate interest in ensuring that a candidate makes a preliminary showing of support among the electorate before appearing on the ballot. In addition, the pandemic has not completely deprived candidates of the ability to gather signatures. Between February 11, 2020, when the nomination papers were first made available, and March

Faulkner for Va. vs. Virginia Dep't of Elections, CL2000-1456, Cir. Ct. of Richmond (Mar. 25, 2020) (order reducing signature requirement for candidates seeking to be Republican Party nominees for United States Senate from 10,000 to 3,000).

23, 2020, when the first significant restrictions were imposed in response to the pandemic, candidates had forty-one days in which to gather signatures without any constraint. Since March 23, the process has become unconstitutionally burdensome, but not impossible. And the remedies we provide in this decision will permit additional signatures to be safely obtained. It would not be equitable, therefore, to declare the minimum signature requirements void altogether.

Given the looming deadlines, the plaintiffs also request, in the alternative, that we extend the deadlines for submitting nomination papers to local election officials and for filing the certified nomination papers with the Secretary. The Secretary, however, maintains that an extension beyond May 5 for submissions to local election officials and May 26 for filing with the Secretary is not workable, given the time needed for the SBLC to deal with any objections to the nomination papers, for the Secretary's office to prepare the 2,200 different styles of ballots required for the different jurisdictions in the Commonwealth, and for local election officials to then transmit the ballots by July 18 to military and overseas voters, as required by Federal law. The plaintiffs have not disputed the Secretary's timeline or his analysis of the problems that would arise from a greater extension, and we defer to his experienced judgment in this regard. Therefore, we will extend the

deadlines only for candidates running for State district and county offices, and extend their deadlines only to match the deadlines that apply to party candidates running for Federal and Statewide offices: from April 28 to May 5 to submit nomination papers to local election officials for certification, and from May 26 to June 2 to file the certified nomination papers with the Secretary.

The plaintiffs have further requested, as alternative relief, that we "substantially" reduce the number of signatures required to get on the primary election ballot. The Secretary agrees, but suggests that the reductions should only apply to offices for which 1,000 or more certified voter signatures are currently required. This would preclude any reduction of the required minimum signatures for candidates for State senator and representative, who currently must secure 300 and 150 signatures, respectively, and for offices in certain counties (e.g., Barnstable County register of probate and Barnstable County commissioner), who currently need to obtain 500 signatures. We agree that, in light of the prevailing circumstances, the most equitable alternative is to reduce the number of signatures required. We do not agree, however, that it would be equitable to do so only for some candidates and not others.

Presumably, the number of signatures required for each office was established to reflect a balance between the number of people represented by the elected office and the burden involved in obtaining the signatures.  Hence, a Statewide office such as United States senator warrants burdening a candidate with a requirement of gathering 10,000 signatures, while an office representing fewer people, such as a State senator, warrants a signature requirement of 300.  It seems only just that the same rationale should apply when it comes to reducing the minimum numbers in response to the pandemic, and that the same percentage decrease should apply to all offices.  To hold otherwise would alter the relative ratio of the minimum requirements chosen by the Legislature.  For instance, a primary candidate for the State Senate must gather only three per cent of the signatures that a primary candidate for the United States Senate must gather; that ratio should not be altered by the remedy we devise.

In determining the percentage of the across-the-board reduction, the Secretary has suggested a reduction of fifty percent (50%), the same amount that has been proposed in one of the bills currently pending in the Legislature.[15]  We agree with

_____

[15] We note that both the Secretary and 2020 Senate Doc. No. 2632 would limit this fifty percent (50%) reduction to offices requiring 1,000 or more signatures.

that suggested percentage decrease.  Fifty percent (50%) has a rational connection to the underlying constitutional violation.  As noted supra, the candidates had forty-one days after the date when nomination papers were first made available (February 11) to gather signatures without any significant restrictions related to the pandemic.  That all changed on March 23, when the Governor issued the order limiting public and private gatherings to no more than ten people, requiring all nonessential businesses to close their physical workplaces and facilities, and directing DPH to issue the Stay-at-Home Advisory, urging people to leave home only for essential errands and to practice social distancing when they did.  Forty-one days is almost exactly fifty percent (50%) of the time between February 11 and May 5, which is now the deadline by which all primary candidates have to collect signatures and submit them to local election officials.  Even if candidates were slow to start, it was significantly challenging, but not impossible, to gather signatures after March 23, and as discussed infra, candidates will now have some opportunity to obtain electronic signatures through May 5, so it should not be unfairly burdensome for a serious candidate to obtain one-half of the required signatures. The number of certified registered voter signatures required to get on the September 1 primary ballot, therefore, is reduced by fifty percent (50%) for all candidates.

Finally, the plaintiffs also request that we order State officials to explore "less stringent strategies" for the collection and submission of signatures, such as through the electronic collection of signatures. They note that a few States have implemented the use of electronic signatures and submissions for purposes of securing access to the ballot, including at least two that did so in response to the current pandemic.[16] In the order reserving and reporting this case to the full court, the parties were asked to address the logistics of, and potential problems with, collecting and verifying electronic signatures. Their submissions have convinced us that there are too many issues and unanswered questions to allow us confidently to impose a remedy that would transform a nomination system that required "wet" signatures into one that permitted a broad range of electronic signatures, including a printed name. To name just a few, there are the inherent time constraints discussed <u>supra</u>; there are potential logistical, legal, and cyber-security related concerns; and, of course, there is the

---

[16] Arizona already had adopted an electronic candidate nominating system called "E-qual," which allows voters to show support for candidates "from the comfort of [their] home[s] or anywhere [I]nternet access is available." See https://apps.azsos.gov/equal [https://perma.cc/2HDB-YHSF]. New Jersey and Florida, meanwhile, have taken some action in this regard in response to the pandemic. See New Jersey Governor, Executive Order No. 105 (Mar. 19, 2020); Florida Secretary of State, Emergency Rule No. 1SER20-2 (Apr. 3, 2020).

fact that local and State governments are already operating under severe constraints, and often with skeletal staffing, due to the pandemic.

The Secretary, however, has suggested one modest means to include electronic signature collection among our equitable remedies, which the plaintiffs find attractive, as do we. Specifically, the Secretary proposes that we order that candidates seeking to be on the ballot for the September 1 primary election be allowed to scan and post or otherwise distribute their nomination papers online. Voters may then download the image of the nomination papers and either apply an electronic signature with a computer mouse or stylus, or print out a hard copy and sign it by hand. The signed nomination paper can then be returned to the candidate, or a person working on the candidate's behalf, either in electronic form (by transmitting the "native" electronic document or a scanned paper document) or in paper form (by hand or mail). The candidates will still have to submit the nomination papers to local election officials in hard copy paper format, but the proposed process will alleviate the need for, and the risk associated with, obtaining "wet" signatures. The Secretary is ordered forthwith to provide clear guidance to prospective candidates as to how this electronic signature collection process may be

accomplished effectively, although candidates need not await that guidance to get started.

Conclusion. For the reasons stated, the plaintiffs' application for declaratory relief is allowed to the extent that we declare, in the limited context of the current pandemic, that the minimum signature requirements in G. L. c. 53, §§ 7 and 44, for candidates in the September 1, 2020, primary election are unconstitutional. As a remedy for this constitutional violation, we order that (1) the number of required signatures be reduced by fifty percent (50%) for all offices; (2) the deadlines for candidates running for State district and county offices to submit their nomination papers to local election officials for certification and for the filing of certified nomination papers with the Secretary be extended to May 5, 2020, and June 2, 2020, respectively, which are the current due dates for party candidates running for Federal and Statewide offices; and (3) subject to the restrictions outlined in this decision, the Secretary shall allow the submission and filing of nomination papers with electronic rather than "wet" signatures.

So ordered.

KAFKER, J. (concurring).  Given the pressing need for immediate action during the pandemic, and the technological limitations in our existing electoral infrastructure identified by the Secretary of the Commonwealth (Secretary), I concur in the court's multifaceted remedy.  I write separately, however, to express concern that those responsible for our electoral process have concluded that they are unable to solve the problem of in-person signatures with the more straightforward and targeted solution of electronic filing of signatures, and therefore have required the court to temporarily rewrite the election laws.  Those responsible for our elections must have the technological tools to respond to the pandemic that confronts us, which has fundamentally changed the world as we know it.  Leaving these electoral problems for the courts to solve should be a last resort.

When we declare an act unconstitutional, we must do so in the least intrusive and most judicious manner possible.  See Duracraft Corp. v. Holmes Prods. Corp., 427 Mass. 156, 167 (1998) ("We must construe statutory provisions, when possible, to avoid unconstitutionality, . . . and to preserve as much of the legislative intent as is possible in a fair application of constitutional principles").  Even as these extraordinary circumstances require us to fashion judicial remedies for such constitutional violations, we must do our utmost to avoid making

policy decisions that are the responsibilities of other branches of government. See Commonwealth v. Leno, 415 Mass. 835, 841 (1993) (recognizing "the undesirability of the judiciary substituting its notions of correct policy for that of a popularly elected Legislature" [quotations and citation omitted]). Our duty is to do the minimum of what is necessary to conform those statutes to the Massachusetts Constitution, and not to rewrite those statutes more extensively. See id. See also Aptheker v. Secretary of State, 378 U.S. 500, 515 (1964) ("Although this Court will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of a statute or judicially rewriting it" [quotation, citation, and alteration omitted]).

The fundamental issue here is the statutory requirement that nomination signatures be obtained "in person." See G. L. c. 53, § 7. As the court highlights, and as we have previously stated, the State has a legitimate interest in ensuring that candidates have a "substantial measure of support" before they may appear on the ballot. See Libertarian Ass'n of Mass. v. Secretary of the Commonwealth, 462 Mass. 538, 567 (2012), quoting Barr v. Galvin, 626 F.3d 99, 111 (1st Cir. 2010), cert. denied, 565 U.S. 929 (2011). Otherwise, the ballot would be overcrowded and confusing. See id. at 567 & n.29. Moreover,

the requirement that candidates obtain a minimum number of signatures in order to qualify for the ballot is reasonably related to this interest.  See id.  Rather, it is the in-person aspect of the signature requirement that renders it unduly burdensome in light of the current pandemic and quarantine, as this requirement presents public safety risks for both the campaign and individual signatories.  An in-person signature simply cannot be obtained without endangering the health of those collecting the signatures and those signing their names.

The least intrusive remedy to this constitutional deficiency would be one that carves out the in-person requirement and replaces it with its nearest equivalent: electronic signatures.  This solution should be technologically feasible and relatively straightforward in the midst of a pandemic:  use electronic nomination papers that can be electronically signed by voters and electronically submitted to local election officials.

Electronic signatures are the norm in the private sector and many areas of government.  Even before automatic voter registration took effect, the Secretary maintained an online portal that allowed citizens to complete an online affidavit using an image of their electronic signature from the registry of motor vehicles to register to vote.  See G. L. c. 51, § 33A. The Legislature has also already laid the groundwork for the

verification of registered voters' electronic signatures. The Legislature has expressly determined that, as a general matter, "[a] record or signature may not be denied legal effect or enforceability solely because it is in electronic form," and, "[i]f a law requires a signature, an electronic signature satisfies the law." G. L. c. 110G, § 7 (a), (d). The Legislature and the Secretary have also facilitated certain business filings by allowing both electronic signatures and electronic submissions. See G. L. c. 156D, §§ 1.40 et seq. (including electronic signatures in definition of "sign" or "signature" for purposes of incorporation); 950 Code Mass. Regs. § 113.06(4) (2006) (requiring "original" signature on corporate filings unless documents are submitted "by authorized electronic or facsimile transmission"). If this trend toward acknowledging electronic signatures is acceptable for the registration of voters and the creation of businesses, it should also be sufficient to meet ballot signature requirements.

One would think that, had electronic signatures been expeditiously approved for use on nomination papers by the Legislature and the Secretary, nothing more would be necessary to remedy the unconstitutional burden here. In an age dominated by social media sites like Facebook and Twitter, and one that requires sophisticated digital political campaigning, it is difficult to imagine that a viable legislative candidate for the

State house or State senate would be unable to electronically alert and engage the 150 or 300 followers that the candidate needs to obtain electronic signatures to appear on the ballot. Those seeking Statewide office should also be able to satisfy their reasonable signature requirements if a readily accessible electronic signature process were adopted. Indeed, this would presumably be the norm if the technical capacities of our election infrastructure were anywhere near as sophisticated and adaptable as those of the private sector and other areas of government.

Unfortunately, according to the Secretary, election officials lack the technological capacity at this time to readily accept electronic signatures for ballot nominations. The Secretary contends that there are significant limitations on the capacity of local and State election officials to receive and verify such electronic signatures for the purposes of satisfying the signature requirements, even when those requirements involve a manageable numbers of signatures, ranging from 150 to 10,000, plus the additional number of signatures necessary to create a margin of error for the candidates. Specifically, the Secretary contends that individual municipalities may not be able to open large e-mail attachments containing voter signatures, and may be unable to access online file storage sites due to cybersecurity concerns. Why this

remains so difficult in the modern era is somewhat inexplicable. Why a simple e-mail attestation that includes the name, address, and party registration of the voter is insufficient is also not obvious. The process for verifying even "wet" signatures appears to consist primarily, if not completely, of a comparison of the name, address, and voter registration on the "wet" signature with the name, address, and voter registration on record. See 950 Code Mass. Regs. § 55.03(1) (2004). Why a simple e-mail is more suspect than a "wet" signature remains unclear.

Nevertheless, because of the current technological limits on our election capabilities and the procedural requirements of the current process, candidates will be forced to continue to submit their nomination papers in hard copy form. According to the Secretary, we are limited to the following process for allowing electronic signatures. First, candidates will be permitted to electronically post or distribute their nomination papers. Then, voters must download the papers and either electronically sign, or print and physically sign, the document and return it to the candidate in electronic or paper form. The candidate will then be tasked with producing all voter signatures in hard copy paper format, and physically submitting his or her nomination papers to local officials for certification. At minimum, this awkward, multistep process will

require candidates or campaign volunteers to risk exposure to the virus by venturing out, either to the post office or a local official's physical office, in order to deliver the nomination papers to election officials.

Allowing voters to submit their signatures electronically as part of this cumbersome process, by itself, is not enough to fix the problem.  Indeed, the parties agree that this stilted approach to electronic signatures is not enough.  Rather, given the apparent lack of technological capacity to readily accept and verify electronic signatures in a more straightforward manner -- even in the midst of a global pandemic -- this court is instead forced to impose alternative remedies, such as reducing the statutorily prescribed signature threshold and extending the time limits for gathering signatures.

Unfortunately, these alternative remedies raise other constitutional issues.  When we start to alter the numbers of signatures required to qualify for the ballot, we begin to stray into territory reserved for the Legislature.  See Kenniston v. Dep't of Youth Servs., 453 Mass. 179, 189 (2009).  While reducing the signature threshold by fifty percent may be a sound Solomonic solution, and roughly corresponds to the amount of time candidates have lost, this appears to be more of a policy choice best left to the Legislature, which can act with great

dispatch when it chooses to do so.[1]  Nonetheless, in the instant case, at this last minute in the signature gathering process, and in the absence of legislative action, this court is forced to impose these alternative remedies itself to conform the election laws to constitutional requirements during the pending emergency.  These remedies also appear to be the least intrusive ones available, in light of the deficient technological capabilities identified by the Secretary and the imminent approaching deadlines for submitting nomination papers.

In this "high tech" era, and in the midst of a global pandemic that severely restricts close personal contact, the failure to be able to solve manageable technological problems on the eve of an election is confounding and distressing.  At a time when we need to be fundamentally rethinking what must be done in person and what can instead be done electronically, our electoral process seems dangerously unequipped to adapt to a new paradigm.

The COVID-19 pandemic has dramatically changed our current reality, not only in the Commonwealth, but across the globe, and not simply for a month or two.  Despite the significant negative

---

[1] We recognize that elected officials are presently operating under the same quarantine restrictions as the rest of the Commonwealth.  This makes the enactment of major substantive changes more difficult to accomplish, particularly where such changes require collaborative efforts among significant numbers of people.

effects of this lockdown, health officials have urged the importance of maintaining quarantine efforts for the foreseeable future. Tozzi and Bloomberg, "Social distancing until 2022? It may be necessary, according to Harvard coronavirus researchers," Fortune (Apr. 14, 2020) https://fortune.com/2020/04/14/social-distancing-until-2022-coronavirus-end-date-spread-covid-19-harvard-researchers/ [https://perma.cc/HQJ5-4257]. It remains to be seen when the current measures will no longer be necessary. The Governor has indicated that the existing lockdown will remain in place until at least May 4, 2020. See COVID-19 Order No. 21. Even to the extent that the spread of the virus slows in the coming months, there are indications it may again surge in the fall. See Tozzi and Bloomberg, supra. In any event, it is clear that the effects of COVID-19 will be felt for years to come, and that we must adapt to face the long-term logistical challenges that this new reality poses to our society, particularly for in-person interactions.

Other States have adapted their election machinery to address the electronic signature problem. As the court observes, ante at note 16, Arizona has adopted a centralized system for allowing voters to electronically sign candidates' nomination papers, called "E-Qual." See https://apps.azsos.gov/equal/ [https://perma.cc/2HDB-YHSF]. The E-Qual website prompts voters to provide select personal

information, which is then used to access their voter registration record.  See id.  Once their voter registration record has been identified, voters may electronically sign a candidate's nominating petition.  See id.  As the website boasts, this system allows voters to show their "support for a candidate from the comfort of [their] home[s] or anywhere [I]nternet access is available."  See id.

Despite the apparent lack of technological solutions available for purposes of the current election cycle, it would appear that the Commonwealth has the means to ameliorate this issue going forward, though not in time to address the issue before the court.  As explained by the amicus, the Commonwealth is already expanding its acceptance of electronic signatures in other areas of election administration.  Pursuant to legislation passed in 2018, the Commonwealth began implementing an automatic voter registration process on January 1, 2020.  See G. L. c. 51, § 42G½; St. 2018, c. 205, § 4.  As a part of this process, automatic voter registration agencies, such as the registry of motor vehicles,[2] must transmit a voter's electronic signature to the Secretary, who transmits the same to the board of registrars

---

[2] An "automatic voter registration agency" is defined as "a location at a state agency where an eligible citizen may register to vote."  G. L. c. 51, § 42G½ (a), (b).

or election commission of the city or town where the voter resides. G. L. c. 51, § 42G½ (e).

Municipal registrars therefore already have at least a growing database of electronic signatures of voters registered in the Commonwealth. It follows, then, that they should have the capability to compare electronic signatures submitted for a candidate's nomination papers with electronic signatures submitted by automatic voter registration agencies. See G. L. c. 51, § 42G½; 950 Code Mass. Regs. § 55.03(1)(b). They should therefore be able to scale up to wider use of electronic signatures in the near future. That future, however, is apparently not now. For that reason, I am forced to concur.

In sum, while I agree with the court that the technological limitations described by the Secretary prevent us from replacing the in-person requirement with electronic signatures alone in the short time before the signatures are due, and require the multifaceted remedy the court proposes, I feel compelled to emphasize that those responsible for our election process must have the necessary tools to quickly adapt to the current pandemic and the future crises to follow. Absent such technological adaptability, our elections will be imperiled and our election laws may themselves have to be rewritten in the midst of a crisis, as was done here. That is an invitation to conflict and confusion that must be avoided.